**FARMERS UNION GRAIN TERMINAL ASSOCIATION, Appellant,**

v.

**INDUSTRIAL ELECTRIC CO., Respondent.**

**No. CO–84–1478.**

Court of Appeals of Minnesota.

March 26, 1985.

Review Denied June 14, 1985.

John P. Lommen, Kay Nord Hunt, Lommen, Nelson, Sullivan & Cole, Minneapolis, Robert R. Reeder, Eugene J. Maginnis, Cozen, Begier & O'Connor, Philadelphia, Pa., for appellant.

Paul A. Joyce, Jr., St. Paul, for respondent.

Heard, considered and decided by FORSBERG, P.J., and PARKER and LANSING, JJ.

## OPINION

PARKER, Judge.

The Farmers Union Grain Terminal Association (GTA) appeals from judgment entered after a jury determined that Industrial Electric was negligent in the installation and repair of an electrical system, but that its negligence did not cause an explosion at the grain terminal. GTA contends the trial court erred in refusing to allow its expert to give testimony rebutting Industrial Electric's theory of causation and in allowing an unqualified expert for Industrial Electric to give an opinion as to causation. We reverse and remand for a new trial.

## FACTS

GTA operates a grain terminal in St. Paul, where an explosion occurred on June 10, 1980, causing $1.6 million in property damage. GTA sued three parties who had been involved in the expansion of the terminal about a year before the explosion, alleging negligent design, installation, and repair of the electrical and dust control systems. Two parties settled before trial, leaving Industrial Electric as the only defendant. The parties stipulated as to damages, so the only issues at trial were negligence and causation.

GTA contended that Industrial Electric had installed the new electrical system so that too many motor control wires ran through a single conduit in each of three "pull boxes" located in a tunnel connecting the hopper area (where grain was dumped) to the elevator (where grain was stored). A conveyor belt runs from the hopper through the tunnel to what is called a "leg," which is a vertical, enclosed conveyor that transfers the grain to the top of the elevator.

There was conflicting testimony at trial as to whether the system as installed violated the electrical code. However, GTA presented evidence that within 18 months of installation three short-circuits occurred in the tunnel. It contacted Industrial Electric and asked for a new wiring job to prevent the shorts.

The day before the explosion, an electrician from Industrial Electric went to the terminal to examine the system. He shut off the power in the tunnel for most of the time he was there examining the system. He removed the pull box covers in order to inspect the wiring. Testimony at trial showed that the covers are designed to be air-tight to prevent any contact between sparks and grain dust. He did not replace the covers on the pull boxes before he left.

The next day he returned and was joined by two other electricians who were to help him replace the wiring. The terminal was operating normally; grain was being dumped into the hopper and carried through the tunnel on the conveyor belt. The electrician turned on the power so the tunnel would be lighted while he explained the planned work. After they walked through the tunnel the three men left the area for a coffee break. The electrician did not turn off the power until after the explosion, which occurred within half an hour.

GTA's theory is that an electrical arc occurred in one of the pull boxes while the cover was off and while the power was on, which ignited grain dust in the tunnel. Industrial Electric does not deny that the

explosion occurred in that tunnel, but contends that an overheated nine-inch drift pin inside the leg (the vertical conveyor at the end of the tunnel) caused the explosion. Its theory was that GTA negligently allowed the metal buckets inside the leg to rub continually against the drift pin, which ignited the dust enclosed within the leg. The pull box and the leg were approximately 40 feet apart.

The day after the explosion, two experts from a panel of the National Academy of Sciences, Charles Kauffman and Robert Hubbard, were sent to investigate the explosion. Kauffman has a master's degree in physics and a Ph.D. in aerospace science. His specialty area is the study of explosions. He had personally investigated 12 grain terminal explosions. Hubbard was a vice president of Cargill and manager of operations for its grain division. His area of expertise was maintenance of the physical plant. He had participated in studies of grain terminal explosions and given talks on dust control and explosion prevention.

At trial Charles Kauffman testified, based on his analysis of the explosion pattern, that the explosion must have occurred when an electrical arc in pull box # 2 ignited grain dust in the tunnel. Pull box # 2 was located a few feet from the hopper area. There was no direct evidence that an arc had occurred, but Kauffman said that was the only hypothesis consistent with the damage pattern. Robert Hubbard testified that the explosion occurred because of the overheated drift pin. In addition, the court allowed Terry Mueller, a State OSHA inspector, to testify that the explosion was caused by the drift pin.

GTA's case-in-chief was directed solely at its theory that an arc in the pull box caused the explosion. Kauffman testified generally that an explosion in the area of the leg was not consistent with the damage pattern. The words "drift pin" were never mentioned in his testimony either on direct or cross-examination.

After the defense called Hubbard to testify about the drift pin theory, GTA called Kauffman as a rebuttal witness. Kauff-man was prepared to testify that, in his opinion, the drift pin could not have caused the explosion because it was not hot enough or large enough to have been a primary ignition source. GTA would have offered a chart showing the ignition potential in relation to surface air, surface temperature, and dust-air particles. Industrial Electric opposed this testimony on the ground that it was improper rebuttal and should have been presented in GTA's case-in-chief. The trial court sustained the objection on the ground that the rebuttal testimony would merely repeat Kauffman's testimony on direct that the explosion did not occur in the area of the leg. As a result the plaintiffs were never allowed specifically to refute the drift pin theory.

The jury found that Industrial Electric was negligent but that its negligence did not cause the explosion. The jury also found that GTA was not negligent.

## ISSUE

Did the trial court err in refusing to allow Kauffman's rebuttal testimony on the drift pin theory of causation?

## DISCUSSION

GTA argues that the trial court prejudicially erred in refusing to allow Kauffman's rebuttal testimony on the critical issue of causation. It contends the prejudice is evident because the jury verdict leaves open the question of what constituted the causative factor in the explosion.

 Rebuttal evidence is that which explains, contradicts, or refutes the defendant's evidence. Its purpose is to cut down defendant's case and not merely to confirm that of the plaintiff. *Van Tassel v. Patterson,* 235 Minn. 152, 160, 50 N.W.2d 113, 117 (1951). The fact that testimony would have been more proper for the case-in-chief does not preclude the testimony if it is proper both in the case-in-chief and in rebuttal. *United States v. Luschen,* 614 F.2d 1164, 1170 (8th Cir.1980). What is proper rebuttal evidence rests almost wholly in the discretion of the court. *Briggs v. Chicago*

*Great Western Railway Co.*, 248 Minn. 418, 427, 80 N.W.2d 625, 633 (1957).

In *Weiss v. Chrysler Motors Corp.*, 515 F.2d 449 (2d Cir.1975), the court ordered a new trial because rebuttal evidence on a crucial issue was disallowed. The court reasoned:

> While a trial judge has discretion to exclude rebuttal evidence which would have been admissible if offered as evidence in chief, * * * such discretion should be tempered greatly where the probative value of proffered evidence is potentially high and where such evidence, though admissible on the case in chief, was unnecessary for the plaintiff to establish in its prima facie case.
>
> * \* \* \* \* \*
>
> "The plaintiff was not required to offer evidence which positively excluded every other possible cause of the accident."

*Id.* at 457–59 (quoting *Rosenberg v. Schwartz*, 260 N.Y. 162, 166, 183 N.E. 282, 283 (1932)).

Industrial Electric cites *Skogen v. Dow Chemical Co.*, 375 F.2d 692 (8th Cir.1967), and *Russo v. Peikes*, 71 F.R.D. 110 (E.D. Pa.1976), in support of the trial court's refusal to allow rebuttal evidence. In those cases, however, the disallowed rebuttal testimony was a necessary element of the prima facie case.

█ We agree that it is unnecessary to require anticipatory rebuttal of defense theories. In the normal course of litigation the defense may assert several theories before trial. Its final position may well depend on seeing the plaintiff's case as presented in court. It would unnecessarily lengthen trials and increase the expense of litigation to require rebuttal of each possible defense theory in the plaintiff's case-in-chief.

█ Industrial Electric asserted, in interrogatories produced just a few weeks before trial, that it might call an expert witness to testify that an overheated bearing caused the explosion. It had previously indicated that careless cigarette smoking by a GTA employee may have been another cause. Thus, Industrial Electric had several possible theories. GTA presented a prima facie case based on its theory that pull box # 2 caused the explosion. Kauffman's rebuttal testimony was not necessary in the prima facie case and was not merely cumulative, but would have specifically rebutted the defense theory. Causation was the critical issue, and the probative value of the testimony was high. As in *Weiss v. Chrysler Motors*, resolution of the issue depended largely on the outcome of a battle of experts. The rebuttal testimony should have been allowed in the exercise of sound judicial discretion.

We also agree that the prejudice to the plaintiffs is evident in the jury verdict, which left unresolved the issue of causation. The error was exacerbated by the court's liberal, but not clearly erroneous, decision to allow a State OSHA inspector to agree with the drift pin theory. The defense thus presented two experts fixing the drift pin as the causative factor, while the plaintiffs were allowed to present no testimony regarding the drift pin as the ignition source.

### DECISION

The trial court committed prejudicial error in excluding rebuttal testimony when that testimony was · unnecessary in the plaintiff's prima facie case, related to a critical issue, and was highly probative.

Reversed and remanded for a new trial.