**RILEY BROS. CONSTRUCTION, INC., Respondent,**

v.

**Craig SHUCK, d/b/a Beaver Masonry, Appellant.**

No. A04–2133.

Court of Appeals of Minnesota.

Oct. 4, 2005.

Derek A. Trosvig, Swenson Lervick Syverson Anderson Trosvig Jacobson, P.A., Alexandria, MN, for respondent.

John E. Mack, New London, MN, for appellant.

Considered and decided by RANDALL, Presiding Judge, KLAPHAKE, Judge, and WILLIS, Judge.

## OPINION

KLAPHAKE, Judge.

Craig Shuck, d/b/a Beaver Masonry, appeals from the district court's award of a $78,522 judgment to respondent Riley Brothers Construction. Appellant argues: (1) the evidence presented at the bench trial fails to support the district court's determination that a contract existed between the parties; (2) the evidence does not support application of the doctrine of promissory estoppel; (3) the district court erred in its determination of damages; and (4) the district court erred in evidentiary rulings, which entitle appellant to a new trial. Because the evidence reasonably supports the district court's findings and because the court did not err in its application of the law, we affirm.

## FACTS

In the spring of 2002, the city of Wahpeton, North Dakota, requested bids for a project that involved the construction of parking lots and roadways. Respondent is a large construction company specializing in highway work and, upon learning of the Wahpeton project, decided to submit a "prime bid." Respondent obtained a complete set of specifications and blueprints for the project, which involved substantial concrete work. Respondent performs excavation and construction of bituminous surfaces including roads and parking lots; because it does not perform concrete work, respondent intended to rely on subcontractors to complete that portion of the project.

Appellant runs Beaver Masonry as a sole proprietorship and is engaged in the concrete and masonry business. Appellant learned that respondent intended to submit a prime bid for the Wahpeton project, and on March 21 contacted respondent.

Appellant spoke with Jeff Anderson, one of respondent's project managers, regarding its plans for the project. Anderson told appellant that respondent had plans, but that he could not send them to him. Anderson offered to send appellant the summary specifications and "bidder's proposal" for the concrete work, which he faxed to appellant that same day. Anderson testified that he faxed the pages so that appellant could "see if he was interested in bidding the job" and that he did not intend appellant to prepare his bid solely from theses pages.

On March 26, appellant faxed his bid for the concrete work to respondent. Appellant's bid contained a price for each section of the concrete work and provided that the total cost of the concrete work for the project was $537,281. The bid provided that the "price includes all control joints, laser screed concrete, gravel base will be graded and ready for concrete by site contractor."

As Anderson was preparing to submit the prime bid to the City of Wahpeton, he determined that appellant's bid was the lowest, but noticed that his total did not include approximately $4,000 that appellant had listed for the "tank slab" and that the bid did not list whom it was from. On April 1, Anderson called appellant to confirm that the $4,000 for the tank slab should be included in the total cost and asked appellant to resubmit his bid on company letterhead. Appellant faxed a second bid to respondent that contained his company information. Anderson then prepared respondent's prime bid for the project using appellant's bid without "marking up" the price for the concrete work.

The next lowest bid respondent received for the concrete work on the project was approximately $711,000; appellant's bid was approximately 24% lower than this bid. Respondent's president, Joe Riley, testified that bids for the same work may vary by 25% to 30%, and that he has seen variations as high as 40%. He testified bids vary because of a contractor's time schedule, whether the contractor has a skilled foreman and crew, and many other factors. Because of these variations, he did not believe that appellant's bid was disproportionately low.

On April 1, Anderson drove to Wahpeton and submitted respondent's bid for the project in the amount of $1,522,058. That afternoon, the bids were opened and respondent was the lowest bidder.

On April 2, appellant telephoned to inquire whether it was the lowest bidder and whether respondent had used appellant's bid. Appellant spoke with Jim Rentz, who was also a project manager for respondent. Rentz told appellant that respondent was the lowest bidder and that it had used appellant's numbers when preparing its bid. After learning that respondent had used his bid, appellant proceeded to tell Rentz how many cubic feet of concrete his company could complete in a day and that he would be using a new machine.

On April 24, respondent was offered the general contract for the Wahpeton project. Work began on the Wahpeton project on May 14, 2002.

On May 21, Anderson telephoned appellant and requested that he attend a meeting at the job site to discuss job responsibilities and timelines for the concrete work. The next day, appellant attended the meeting at the job site with Anderson and another foreman. Appellant admitted that he knew at the time of the meeting that respondent intended to use him for the concrete work and that "callin[g][him] out to the meeting" was a "binding thing."

At the meeting, appellant got his first opportunity to review the blueprints for

the project. After returning home, he compared his bid to the requirements of the blueprints and realized there were substantial differences between his bid and the specifications. In making his bid, appellant had assumed the tank slab consisted of eight-inch slabs of concrete, but the blueprints required the slabs to be three feet thick. Appellant testified that in order to complete the tank slab according to the blueprints would require an additional $80,000 over what he had bid. He also discovered that certain portions of the concrete were "reinforced," which he testified would mean that sawing joints into the concrete would require an additional $20,000 over what he figured in his bid. Appellant further noticed that the contract was a "Davis–Bacon Act" contract, which would require paying his workers a higher wage.

Two days after the meeting, Anderson called appellant to ask if he wanted information that respondent had obtained regarding concrete materials. The conversation lasted 12 minutes. Appellant did not raise his concerns regarding his bid during this call. Anderson attempted, unsuccessfully, to contact appellant again over the next few days. On June 5, Anderson again spoke with appellant at which time appellant informed Anderson he would not enter into a contract to perform the concrete work for the price that he submitted in his bid.

On June 11, Joe Riley called appellant to discuss his refusal to perform the concrete work. Appellant informed Riley that he would need an additional $80,000 to complete the concrete work and that his price did not include sawing and sealing joints in the concrete. Riley testified that when the conversation ended, he was certain that appellant would not perform under his bid and that he then started looking for another contractor to perform the work. Riley also testified that he did not have the option of asking the City of Wahpeton for additional money to perform the concrete work.

Respondent was able to get two contractors to perform all the concrete work. Respondent paid a total to the two companies of approximately $620,000; about $79,000 more than appellant's bid for the concrete work.

After completion of the project, respondent sued appellant, alleging that he had breached the contract formed between the parties or, in the alternative, that promissory estoppel should be applied to enforce appellant's promise. In March 2004, following a bench trial, the district court found that appellant's quote constituted a firm bid to perform the concrete work and that respondent accepted the offer on May 21, 2002, when it requested that appellant attend the meeting to discuss the project. The court also found that appellant's bid was not so disproportionately low as to alert respondent that there might be an error in the bid.

The district court further determined that even if it erred in finding a contract existed, respondent "met its burden of proving all the elements of promissory estoppel." The court reached this conclusion based on its findings that appellant intended respondent to rely on his bid for the concrete work and knew that respondent would rely on that bid, that respondent did in fact rely on appellant's bid, and that justice required enforcing the promise because respondent suffered damages from appellant's refusal to honor his bid.

The district court finally determined that the appropriate measure of damages under either theory was the difference between appellant's bid and the amount respondent actually paid for the completion of the concrete work, which was approxi-

mately $78,500, and entered judgment for respondent in this amount.

## ISSUES

1. Does the evidence support the district court's determination that a binding contract was formed between the parties?

2. Did the district court commit evidentiary errors that entitle appellant to a new trial?

## ANALYSIS

The existence of a contract is generally a question of fact. *Morrisette v. Harrison Int'l Corp.,* 486 N.W.2d 424, 427 (Minn.1992). If there is reasonable evidence tending to support the district court's findings of fact, this court will not reverse those findings. *Rogers v. Moore* 603 N.W.2d 650, 656 (Minn.1999).

Minnesota follows the objective theory of contract formation, under which the parties' outward manifestations are determinative, rather than either party's subjective intent. *TNT Props., Ltd. v. Tri–Star Developers LLC,* 677 N.W.2d 94, 102 (Minn.App.2004). Thus, a party's intention to make an offer, or to accept an offer made to him, may be inferred from his words and conduct. *Western Insulation Servs., Inc. v. Cent. Nat'l Ins. Co. of Omaha,* 460 N.W.2d 355, 358 (Minn.App.1990) (acceptance); *Peters v. Mut. Benefit Life Ins. Co.,* 420 N.W.2d 908, 912–13 (Minn. App.1988) (offer).

The district court here found that appellant's bid "constituted an offer to perform the concrete subcontract at the per unit prices contained within his bid" and that respondent accepted the bid on May 21, 2002, when Anderson called appellant to schedule a meeting at the work site to review the timelines for completing his work at the site. Appellant argues that the one-page document that he submitted

was "an estimate" and was not intended to be a firm offer. But the district court concluded that, viewed objectively, the document was a firm offer. We will not reverse that finding if there is reasonable evidence to support it.

The record evidence shows that appellant contacted respondent requesting permission to submit a bid to perform the concrete work on the project. After receiving a 14–page fax from respondent outlining the requirements for the concrete work, appellant submitted a one-page document providing that completion of the concrete work for the project would total approximately $540,000 and that the "price includes all control joints, laser screed concrete, gravel base will be graded and ready for concrete [by] site contractor." Appellant testified that he was aware that respondent would rely on his bid for concrete work when it prepared its bid for the overall project and that he intended for respondent to rely on his bid. Further, the specifications for the project, which were provided to appellant, clearly state that the general contractor cannot charge more for the work performed than the amount listed in its bid, which would lead an objective reader to conclude that he or she could not simply estimate what the costs might be. This evidence is sufficient to support the district court's finding that appellant's one-page document was an offer.

It is well-settled law in Minnesota that unless an offer provides a date at which the offer expires or the offeror revokes the offer, the offer remains open for a reasonable time. *Feges v. Perkins Rests., Inc.,* 483 N.W.2d 701, 708 (Minn.1992) (stating that ability to accept an offer is lost if the offer is revoked at any time before the offer is accepted); *Stone v. Harmon,* 31 Minn. 512, 515, 19 N.W. 88, 89 (1884) (holding that when offer does not contain a

deadline, acceptance must occur within reasonable time); *see also Dyrdal v. Golden Nuggets, Inc.*, 689 N.W.2d 779, 785 (Minn.2004) (applying *Stone* to a lease containing right of first refusal for sale of property).

Here, there was no language in appellant's bid providing for an expiration of the offer, and the evidence reasonably supports the district court's finding that respondent accepted the offer before it was revoked. In particular, Rentz told appellant shortly after April 1 that respondent was the lowest bidder on the project and that appellant's numbers had been used. Anderson contacted appellant on May 21 and requested that he meet with respondent's project supervisors at the project site. Appellant acknowledged that when Anderson requested that he attend the meeting, he knew that respondent intended to have him do the concrete work, but appellant did not communicate to respondent his unwillingness to perform according to the terms of his bid until June 5, more than two weeks after May 21, which is the date that the district court found that respondent accepted the offer. Finally, appellant himself testified that it is not uncommon for an "estimate" to "stay open" for 30 to 45 days. Under these circumstances, we do not believe that an unreasonable amount of time passed before respondent accepted appellant's offer. *See Contstructors Supply Co. v. Bostrom Sheet Metal Works, Inc.*, 291 Minn. 113, 120, 190 N.W.2d 71, 75 (1971) (stating that general contractor should have reasonable time to accept bid after being awarded general contract).

■ Appellant argues that the contract lacked consideration because respondent was not bound by his bid and there was no mutuality of obligation between the parties. Although appellant is correct in stating that respondent was not initially bound by his bid—just as no offeree is bound by the terms of an offer until he accepts it—when respondent accepted appellant's offer to perform the concrete work, respondent was contractually obligated to pay appellant approximately $540,000 for the work he offered to perform. A promise to pay a person in exchange for work he performs is the quintessential example of consideration and needs no further discussion.

■ Citing only his own testimony, appellant also argues that in the construction trade a subcontractor does not expect his bid to be binding until there is a signed construction contract. Unless the contract is covered by the statute of frauds, which no one suggests is the case here, a signed agreement is generally not required for formation of a contract. *Aratex Servs., Inc. v. Blue Horse, Inc.*, 497 N.W.2d 283, 285–86 (Minn.App.1993), *review denied* (Minn. May 11, 1993); *see also* Minn.Stat. §§ 513.01–.07 (2004) (providing types of contracts covered by statute of frauds). While the parties could have agreed that a written agreement was a condition precedent to completion of a contract, there is no evidence to suggest that both parties agreed to such a course of conduct. *Asbestos Prods., Inc. v. Healy Mech. Contractors, Inc.*, 306 Minn. 74, 78, 235 N.W.2d 807, 809 (1975) ("[w]hen contracting parties make the reduction of their agreement to writing and its signature by them a condition precedent to its completion, there will be no contract until that is done."). Although appellant may have believed that he could not be held to his offer until there was a written contract, his mistaken belief that respondent's outward manifestations of assent to his offer were insufficient to form a contract does not absolve him of his obligations under what the law recognizes as a valid contract.

Appellant does not challenge the district court's finding that he breached the con-

tract when he told respondent that he would not perform the work unless he was paid significantly more money. Nor does he specifically challenge the district court's determination of respondent's damages resulting from that breach, or the district court's findings that the mistake in bidding the concrete work was solely his responsibility and that it was not so disproportionately low as to make respondent's reliance on the bid unreasonable. However, because appellant discusses these issues at great length in his discussion of promissory estoppel, we will briefly address them here.

"An offeree will not be permitted to snap up an offer that is too good to be true; no agreement based on such an offer can ... be enforced by the acceptor." *Speckel v. Perkins,* 364 N.W.2d 890, 893 (Minn.App.1985) (quotations omitted). Appellant's bid was 24% lower than the next closest bid. Joe Riley testified that in his experience, bids for the same work can vary between 25% and 30%, and that he had seen variations as high as 40%. Riley testified that bids vary for many reasons, including the contractor's availability and overhead, the skill and knowledge of the contractor's crew, whether the contractor had special machinery, and whether the contractor could obtain favorable prices on material. Respondent did not employ concrete estimators or anyone with expertise in the concrete industry, while appellant had more than 15 years of experience in the concrete industry. We agree with the district court that it was reasonable for respondent to assume that a concrete contractor who is bidding on jobs with a value in excess of $500,000 will obtain all necessary information to properly prepare a bid and that appellant's bid was not so disproportionately low as to alert respondent that the offer might be too good to be true.

Finally, although we conclude that the district court correctly determined that appellant breached the contract, we also affirm the district court's alternative determination that respondent is entitled to recover under the doctrine of promissory estoppel. Application of promissory estoppel requires a showing that (1) there was a clear and definite promise; (2) the promissor intended to induce reliance and such reliance occurred; and (3) the promise must be enforced to prevent injustice. *Olson v. Synergistic Techs. Bus. Sys., Inc.,* 628 N.W.2d 142, 152 (Minn.2001). The district court found that respondent had proved each of these elements, and the record evidence reasonably supports these findings. With respect to the measure of damages under either breach of contract or promissory estoppel, the district court properly determined that respondent's out-of-pocket losses were the difference between the amount it paid to other subcontractors to complete the concrete work and the amount that appellant had submitted in its bid to the City of Wahpeton.

## II.

Appellant argues that the district court erred in excluding the expert testimony from two witnesses offered to prove "trade usage" regarding the nonbinding nature of "estimates." Absent an erroneous interpretation of the law, the question of whether to admit or exclude evidence is within the district court's discretion. *Kroning v. State Farm Auto. Ins. Co.,* 567 N.W.2d 42, 45–46 (Minn.1997). Before this court will order a new trial based on alleged evidentiary errors, appellant must demonstrate that the district court erred in its interpretation of law, or otherwise abused its discretion, and that the alleged error was prejudicial. *See Cloverdale Foods of Minn., Inc. v. Pioneer Snacks,* 580 N.W.2d 46, 51 (Minn.App. 1998) (stating that party is not entitled to

reversal of judgment based on erroneous evidentiary ruling unless party demonstrates prejudice).

Appellant's only legal basis for challenging the district court's evidentiary ruling is his claim that a party has a right to call witnesses to rebut an opponent's testimony, citing this court's opinion in *Farmers Union Grain Terminal Ass'n v. Indus. Elec. Co.*, 365 N.W.2d 275 (Minn.App. 1985), *review denied* (Minn. June 14, 1985).[1] In *Farmers Union*, we noted that "[w]hat is proper rebuttal evidence rests almost wholly in the discretion of the court." *Id.* at 277. We ultimately concluded that the district court's decision to deny the plaintiff's request to recall an expert witness to rebut the testimony of the defendant's expert was prejudicial error because the testimony was "unnecessary in the plaintiff's prima facie case, related to a critical issue, and was highly probative." *Id.* at 278.

As discussed above, the only issue regarding appellant's belief that the contract had to be in writing is whether both parties agreed that the execution of a written contract was a condition precedent to their being bound by the agreement. There is nothing in the record to suggest that either witness had any direct knowledge of such an agreement between the parties. Because the testimony was not highly probative of a crucial issue, appellant has failed to show that the district court erred in excluding the testimony.

## DECISION

Reasonable evidence supports the district court's determination that a contract was formed between the parties on May 21, 2002, when respondent's words and actions established its objective intent to accept appellant's offer to perform the concrete work on the Wahpeton project. Respondent is entitled to its out-of-pocket damages resulting from appellant's breach of that contract.

**Affirmed.**

---

1. We do not address appellant's other conclusory claims of error, which are devoid of legal authority. *See Ganguli v. Univ. of Minn.*, 512 N.W.2d 918, 919–20 n. 1 (Minn.App.1994) (stating court need not address allegations unsupported by legal argument).