Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/22/2016 09:07 AM CDT

Weitz Company, LLC, v. Hands, Inc.,
doing business as H & S Plumbing
and Heating, appellant.
___ N.W.2d ___

Filed July 22, 2016.    No. S-15-581.

1. **Equity: Estoppel.** Although a party can raise estoppel claims in both legal and equitable actions, estoppel doctrines have their roots in equity.

2. **Equity: Appeal and Error.** In reviewing judgments and orders disposing of claims sounding in equity, an appellate court decides factual questions de novo on the record and reaches independent conclusions on questions of fact and law. But when credible evidence is in conflict on material issues of fact, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another.

3. **Forbearance: Estoppel.** A claim of promissory estoppel requires a plaintiff to show: (1) a promise that the promisor should have reasonably expected to induce the plaintiff's action or forbearance, (2) the promise did in fact induce the plaintiff's action or forbearance, and (3) injustice can only be avoided by enforcing the promise.

4. ____: ____. A plaintiff claiming promissory estoppel need not show a promise definite enough to support a unilateral contract, but it must be definite enough to show that the plaintiff's reliance on it was reasonable and foreseeable.

5. **Contracts.** Usages of trade are strong evidence of the foreseeability of reliance on a promise.

6. **Estoppel.** Evidence that a promisee had little time to act on the promise shows that the promisee's reliance was foreseeable.

7. **Contracts: Contractors and Subcontractors.** A general contractor can reasonably rely on a subcontractor's bid even if the general contractor and subcontractor contemplate signing a formal subcontract with additional standard terms after the bidding process ends.

8. **Contractors and Subcontractors.** A general contractor cannot demand that a subcontractor agree to unusual and onerous terms while still holding the subcontractor to its original bid.

9. ____. If a subcontractor's bid is so low that a mistake should be apparent, a general contractor cannot reasonably rely on the bid.

10. **Estoppel: Damages.** No single measure of damages applies in every promissory estoppel case.

11. ____: ____. The damages that the promisor ought to pay under promissory estoppel are those that justice requires.

12. **Damages: Proof.** A plaintiff's burden is to prove his or her damages to a reasonable certainty, not beyond all reasonable doubt.

13. **Election of Remedies.** The election of remedies doctrine is an affirmative defense.

14. **Pleadings.** A party must specifically plead an affirmative defense for the court to consider it.

Appeal from the District Court for Douglas County: Joseph S. Troia, Judge. Affirmed.

Brian S. Kruse, of Rembolt Ludtke, L.L.P., for appellant.

Gregory C. Scaglione, Kristin M.V. Krueger, and Patrice D. Ott, of Koley Jessen, P.C., L.L.O., for appellee.

Heavican, C.J., Wright, Connolly, Cassel, Stacy, and Kelch, JJ.

Connolly, J.

## I. SUMMARY

The Weitz Company, LLC (Weitz), a general contractor, received an invitation to bid on a planned nursing facility. Hands, Inc., doing business as H & S Plumbing and Heating (H&S), submitted a bid to Weitz for the plumbing work, as well as the heating, ventilation, and air conditioning (HVAC) parts of the job. Weitz' bid to the project owner incorporated the amount of H&S' bid. After the owner awarded the project to Weitz, H&S refused to honor its bid. Weitz completed the project with different subcontractors at greater expense.

At trial, Weitz sought to enforce H&S' bid under promissory estoppel. The court determined that Weitz reasonably

and foreseeably relied on H&S' bid, and it therefore estopped H&S from reneging. The court measured Weitz' damages as the difference between H&S' bid and the amount Weitz paid to substitute subcontractors. H&S appeals. We affirm the judgment and the amount of damages.

## II. BACKGROUND

### 1. Weitz Is Invited to Bid

In 2011, the Evangelical Lutheran Good Samaritan Society (Good Samaritan) invited four "prequalified General Contractors," including Weitz, to bid on a proposed nursing facility in Beatrice, Nebraska. Good Samaritan chose the four prequalified general contractors based on "prior relationships" recommendations from its architect and its own research.

Good Samaritan is a "big player" in the retirement living market. Weitz is a "dominant contractor" in the same market. Alan Kennedy, a Weitz executive, said that Weitz had sought to build a relationship with Good Samaritan that would lead to "negotiated work," meaning that Good Samaritan would work with Weitz without inviting other general contractors to bid. Kennedy testified that negotiated work is "one of the best places to be as a contractor." When Good Samaritan invited Weitz to bid on the Beatrice project, Weitz knew of another potential project with Good Samaritan in Sarpy County, Nebraska.

Good Samaritan's "Invitation to Bid" stated that it would not consider bids received after 2 p.m. on August 30, 2011 (bid day). The invitation incorporated certain "Instructions to Bidders," which provided that Good Samaritan and its architect could object to a general contractor's proposed subcontractors. The invitation stated that "[n]o bids may be withdrawn for a period of 60 days after opening of bids." If a general contractor refused to enter into a contract, the instructions provided to bidders state that the general contractor would forfeit its bid security as liquidated damages. A bid security is a bond that "assures the owner that [it] can rely upon the

bids." But Good Samaritan did not ask for bid securities, because it prequalified the general contractors.

## 2. BID-DAY MADNESS

Before bid day, Weitz assigned "lead person[s]" to the different categories of work on the project, referred to as "tickets." The ticket leaders reviewed the project specifications and created a "scope checklist" that described the work for each ticket. Weitz prepared scope checklists because subcontractors sometimes excluded certain work from their bid.

On bid day, Weitz assembled its people in a conference room to collect and organize the hundreds of bids from subcontractors. Ticket leaders called out the bids after comparing them with the scope checklist. Weitz then added the numbers to a "bid day spreadsheet."

Subcontractors in the mechanical, engineering, and plumbing fields typically submit their bids within 15 minutes of the deadline. As a result, Weitz is often "at the wire turning in [its] number to an owner." Brian Mahlendorf, a project executive for Weitz, oversaw Weitz' bid for the Good Samaritan project. Mahlendorf said that Weitz received H&S' bid "less than 15 minutes or so" before the 2 p.m. deadline.

Kennedy, who had been involved in "well over a hundred bids," testified that it was "customary for general contractors to rely on bids submitted by subcontractors" and that subcontractors submit bids because they want the job. Mahlendorf, who had more than 20 years of experience in the construction industry, testified that it was customary for Weitz to rely on subcontractors' bids, that subcontractors knew that Weitz relied on their bids, and that subcontractors submitted bids because they wanted to procure work. Mahlendorf said it was "very rare" for a subcontractor to refuse to honor its bid.

## 3. H&S SUBMITS A BID
### TO WEITZ

On bid day, H&S sent Weitz a bid for the plumbing and HVAC parts of the project. H&S' base bid was $2,430,600. For

alternate duct and radiant heating work, H&S quoted $39,108 and $52,500, respectively. H&S also sent Weitz a "revised" base bid of $2,417,000, but Weitz received the revised bid too late to use in its bid to Good Samaritan.

Kennedy and Mahlendorf would confirm a subcontractor's bid if it looked "funny" or "off," but H&S' bid did not seem unusual to them. Weitz had estimated what each ticket would cost based on historical data, and H&S' bid was above Weitz' estimate. Mahlendorf was also comfortable with H&S because Weitz had worked with H&S before. Furthermore, Mahlendorf assumed that H&S was "actually looking at [its] number" because it sent Weitz a revised bid. Two of the other four prequalified general contractors stated that they planned to use H&S for the plumbing and the HVAC work.

Kennedy and Mahlendorf testified that the market for construction services was weak in 2011. Subcontractors were "aggressively seeking work" and making low bids to "keep their people busy." Kennedy said that subcontractors' bids had "ranges that you hadn't traditionally seen in the marketplace." A difference of 15 percent between the lowest and second-lowest bids was not uncommon.

### 4. WEITZ SUBMITS ITS BID
### TO GOOD SAMARITAN

Mahlendorf said that Weitz used H&S' bid in its own bid to Good Samaritan. Weitz chose H&S' bid because it included the "complete scope with the lowest cost." Mahlendorf said that H&S' bid was "comprehensive" and that Weitz was "willing to take it as is." Mahlendorf added H&S' base bid to Weitz' bid-day spreadsheet for the plumbing and HVAC tickets.

On bid day, Weitz sent Good Samaritan a base bid of $9.2 million. Kennedy and Mahlendorf testified that Weitz' base bid of $9.2 million included H&S' $2,430,600 bid. Weitz promised Good Samaritan that it would execute a contract for its base bid if offered the project within 60 days. Weitz' bid to Good Samaritan included a list of "Major Sub-Contractors."

For the plumbing subcontractor, Weitz wrote "HEP or H&S." For the HVAC subcontractor, Weitz wrote "Falcon or H&S."

Mahlendorf explained that he used a disjunctive list of major subcontractors because H&S' bid "came in late enough after this form had been basically ready to send out, and we had to add [its] name to those two line items." Mahlendorf said that Weitz did not use the bids of the other plumbing and HVAC subcontractors, "HEP" and Falcon Heating and Air Conditioning (Falcon), to reach its $9.2 million base bid. Even if Weitz could have used HEP and Falcon instead of H&S, Mahlendorf said that Weitz intended to use H&S.

### 5. Good Samaritan Awards
#### the Project to Weitz

On September 1, 2011, Weitz received "early indications" that Good Samaritan would select its bid. Weitz received "[f]inal notification" on September 2. Mahlendorf called H&S on September 6 and told the head of H&S' engineering department that Weitz had won the bidding and had "carried the H & S number." He said that he told H&S that "we used [its] number in our bid, and we were prepared to enter into a contract with [H&S] and move forward."

Usually, after the owner of a project accepted Weitz' bid, Weitz asked its subcontractors to sign a "subcontract" establishing the "[e]xact contract terms" between Weitz and the subcontractor. Weitz had used a similar subcontract for more than a dozen years. H&S' chief executive officer testified that in the 10 or 15 times that H&S had worked with Weitz, Weitz had always accepted H&S' revisions to the subcontract.

Weitz signed a contract with Good Samaritan for the base bid of $9.2 million plus six additional areas of work not included in the base bid. The opening paragraph of the contract states that it was "made and entered" on, and has an "Effective Date" of, September 7, 2011. But "Date: 9-19-11" appears below the signature of Good Samaritan's representatives.

Under the contract, Good Samaritan and its architect had the right to reject Weitz' proposed subcontractors. But Good Samaritan did not veto H&S or any of Weitz' other subcontractors. Good Samaritan's architect could not recall having a "conversation of significance" about subcontractors. Despite an owner's reservation of the right to veto subcontractors, Mahlendorf said that "[i]n the real world," a general contractor treats an owner's silence as an approval and that owners are usually silent.

## 6. H&S RENEGES ON ITS BID

Hugh Sieck, Jr., H&S' owner and chief executive officer, was fishing in Alaska on bid day. Sieck testified that he told his team of estimators before he left for Alaska not to send a bid to Weitz. He had "bitter feelings" for Weitz because it had a "history of bid shopping," meaning that Weitz would "get a bid, . . . look at it, and [it] will go to another contractor to get a lower number." Sieck said every general contractor "bid shops," but he thought Weitz did more than most.

John Sampson, who worked for one of the other prequalified general contractors, called Sieck on bid day and suggested that Sieck review H&S' bid. Sampson noticed a "considerable difference" between H&S' bid and the other subcontractors' bids, although he did not say what the difference was or whether the scope of the subcontractors' bids differed. Asked what might prompt him to confirm a bid with a subcontractor, Sampson said a difference of 10 or 15 percent between bids might be enough "if I had to pull a number out of the air," but "when it gets 20 or 30 percent then you really start getting concerned."

According to Sieck, he ordered a member of H&S' estimating team to "[p]ull your bid" after Sieck spoke with Sampson. But when Sieck returned to H&S' offices on September 6, 2011, he learned that his employees had, contrary to orders, submitted a bid to Weitz and had failed to withdraw the bid. He "surmised" that H&S' bid contained errors, so he "told [his] team to go out and find a mistake."

Lloyd Ness, the person responsible for preparing the plumbing and piping parts of H&S' bid, said that Sieck was upset after bid day because H&S "left too much money on the table." Ness testified that H&S' estimating team reviewed its bid after Sieck returned but concluded there "was not a hair out of place." So, according to Ness, Sieck told him to "lie to Weitz and tell Weitz that we forgot travel time and we missed showers." Ness refused to lie and resigned because of the incident. Sieck denied asking Ness to lie. Another member of H&S' estimating team, Thomas Santillan, Jr., said that Sieck did not ask him to lie.

Sieck personally took a hand in looking for a mistake and ultimately landed on a miscalculation involving shower units. He told Santillan to inform Weitz of H&S' "'belief of the mistake.'"

On September 8, 2011, Santillan sent an e-mail with a letter attachment to Mahlendorf stating that H&S had found two errors after "thoroughly reviewing" its bid: (1) a miscalculation of the cost of shower installation and (2) the omission of travel time from the cost of labor. The collective magnitude of the claimed errors exceeded $250,000.

Santillan later took another look at H&S' bid and concluded that the original calculation of the cost for shower installation was, in fact, correct. But Santillan maintained that H&S had underbid travel costs. And Santillan said that H&S eventually unearthed "numerous mistakes" in its bid. Specifically, "the material was just not accurate," "the dollar amount did not appear to be accurate," and "there wasn't enough material."

Mahlendorf came to H&S' offices for a meeting on September 9, 2011. According to Sieck, Mahlendorf mentioned, "'I've got to get to Beatrice because I haven't got all my shopping done.'" Sieck understood Mahlendorf's statement to mean that "as per usual, they are out shopping the bids."

But Mahlendorf said that Sieck's recollection did not "comport with [Mahlendorf's] memory." Asked if Weitz would ever "carry one number but you continue negotiating and replace it

with a different bidder," Mahlendorf said he was "sure that has happened for some reason or another." But he said that Weitz did not intend to shop H&S' bid. H&S' bid was "comprehensive," and Weitz was "willing to take it as is."

Weitz and H&S could not come to terms. The magnitude of H&S' error kept growing and eventually ballooned to more than $430,000. In October 2011, Weitz informed H&S that it would use other subcontractors.

### 7. WEITZ HONORS ITS BID
### TO GOOD SAMARITAN

Weitz did not try to withdraw its bid from Good Samaritan because of its dispute with H&S. Instead, it completed the project with other plumbing and HVAC subcontractors. Kennedy and Mahlendorf testified that the bidding documents prohibited Weitz from withdrawing or modifying its bid for 60 days. And the contract between Weitz and Good Samaritan was "already in progress" by the time Weitz learned that H&S would not honor its bid.

Business reasons also prevented Weitz from abandoning the project. Kennedy testified that the "integrity of our bids" was particularly important if the owner selected Weitz as a prequalified general contractor. Mahlendorf explained that backing out would have harmed Weitz' reputation in its industry:

> On a project like this where the architect and owner have preselected general contractors, if we wouldn't honor our bid, we would be at risk for future work from the design firm that did it and in addition to the owner group. From a business standpoint, we do a lot of [business with] senior living [clients], and it would be detrimental if we were starting to be excluded from senior living clients like the Good Samaritan Society.

Withdrawal would have also lowered Weitz' standing with Good Samaritan's architect, with which Weitz had an "ongoing business relationship."

### 8. WEITZ MEASURES ITS LOSSES

After H&S made it clear that it would not stand by its bid, Weitz asked for bids from other subcontractors. Weitz selected the subcontractors Falcon and "MMC" for the plumbing and HVAC portions of the project because their bids had the "lowest cost complete scope that we could obtain." The amount Weitz paid Falcon and MMC under their subcontracts was $1,187,900 and $1,626,800, respectively. The subcontract prices did not include any "change orders," which could have affected the total amount Weitz ultimately paid to the subcontractors. H&S' bid did not include change orders either.

To calculate Weitz' damages, Mahlendorf added Falcon's and MMC's subcontract prices for the sum of $2,814,700. From that sum, Mahlendorf subtracted H&S' base bid of $2,430,600 and its bids of $39,108 and $52,500 on optional work which Good Samaritan ultimately asked Weitz to perform. The difference is $292,492.

### 9. PROCEDURAL HISTORY

Weitz pleaded two causes of action in its complaint against H&S. First, Weitz alleged that H&S breached a contract formed by Weitz' acceptance of H&S' bid. Second, Weitz argued that promissory estoppel bound H&S to its bid because Weitz reasonably and foreseeably relied on the bid.

A few years after H&S filed its answer—which did not affirmatively allege an election of remedies defense—it moved for an "Order requiring [Weitz] to elect between its claim for breach of contract and promissory estoppel." The court overruled H&S' motion.

After a bench trial, the court determined that the parties had not formed a contract. But it enforced H&S' bid under promissory estoppel. The court awarded Weitz damages of $292,492.

### III. ASSIGNMENTS OF ERROR

H&S assigns, restated, that the court erred by (1) entering a judgment for Weitz on its promissory estoppel claim, (2) "awarding breach of contract damages instead of reliance

damages for promissory estoppel," and (3) overruling H&S' pretrial motion to require Weitz to elect between its contract and promissory estoppel claims.

## IV. STANDARD OF REVIEW

[1,2] Although a party can raise estoppel claims in both legal and equitable actions, estoppel doctrines have their roots in equity.[1] In reviewing judgments and orders disposing of claims sounding in equity, we decide factual questions de novo on the record and reach independent conclusions on questions of fact and law.[2] But when credible evidence is in conflict on material issues of fact, we consider and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another.[3]

## V. ANALYSIS

### 1. Promissory Estoppel

H&S argues that the court should not have enforced its bid under promissory estoppel. Courts often use promissory estoppel to hold a subcontractor to its bid until the general contractor has had a reasonable length of time to accept the bid after receiving the prime contract.[4] The leading case is

---

[1] *deNourie & Yost Homes v. Frost*, 289 Neb. 136, 854 N.W.2d 298 (2014).

[2] *Id.*

[3] *Id.*

[4] See, e.g., *Matherne Contractor v. Grinnell Fire Protec. Sys.*, 915 F. Supp. 818 (M.D. La. 1995); *Ferrer v. Taft Structurals*, 21 Wash. App. 832, 587 P.2d 177 (1978); 4 Richard A. Lord, A Treatise on the Law of Contracts by Samuel Williston § 8:8 (4th ed. 2008); 1 Steven G.M. Stein, Construction Law § 2.05[3][b] (2014); Avery Katz, *When Should an Offer Stick? The Economics of Promissory Estoppel in Preliminary Negotiations*, 105 Yale L.J. 1249 (1996); Janine McPeters Murphy, Note, *Promissory Estoppel: Subcontractors' Liability in Construction Bidding Cases*, 63 N.C. L. Rev. 387 (1985). See, also, Restatement (Second) of Contracts § 87(2) & comment *e.*, illustration 6 (1981). But see *Home Electric Co. v. Hall and Underdown Heating and Air Cond. Co.*, 86 N.C. App. 540, 358 S.E.2d 539 (1987).

*Drennan v. Star Paving Co.*[5] There, the California Supreme Court held that because the general contractor was bound by its bid, fairness required that the general contractor have an opportunity to accept the subcontractor's bid after receiving the prime contract. *Drennan* has had a "very broad following."[6]

[3,4] In Nebraska, a claim of promissory estoppel requires a plaintiff to show: (1) a promise that the promisor should have reasonably expected to induce the plaintiff's action or forbearance, (2) the promise did in fact induce the plaintiff's action or forbearance, and (3) injustice can only be avoided by enforcing the promise.[7] The promise need not be definite enough to support a unilateral contract, but it must be definite enough to show that the plaintiff's reliance on it was reasonable and foreseeable.[8] Here, we start our review of the court's judgment by asking if H&S' bid was a promise on which it should have foreseen reliance.

### (a) H&S' Bid Was a Promise on Which Reliance Was Foreseeable

H&S' bid was a promise to perform the work described in the bid. H&S said it was "bidding the Plumbing, Hydronic Piping, & HVAC portion" of the Good Samaritan project and specifically listed the work that it was willing to perform. H&S asked for the general contractors' "consideration" and hoped to "be of service" to them.

[5,6] And H&S should have foreseen that Weitz would rely on its bid. Kennedy and Mahlendorf testified that subcontractors generally expect (and hope) that general contractors will rely on their bids. Usages of trade are strong evidence of the

---

[5] *Drennan v. Star Paving Co.*, 51 Cal. 2d 409, 333 P.2d 757 (1958).

[6] 4 Lord, *supra* note 4, § 8:8 at 183.

[7] See *deNourie & Yost Homes v. Frost, supra* note 1.

[8] See *id.*

foreseeability of reliance.[9] Furthermore, Weitz received H&S' bid about 15 minutes before the 2 p.m. deadline. Evidence that a promisee had little time to act on the promise shows that the promisee's reliance was foreseeable.[10] And, as noted, H&S expressly asked Weitz to consider its bid. Having determined that H&S should have expected Weitz to rely on its bid, our next question is whether Weitz in fact relied on the bid and, if so, whether its reliance was reasonable.

### (b) Weitz Reasonably Relied on H&S' Bid

Weitz relied on H&S' bid by including the base amount of H&S' bid in Weitz' own bid to Good Samaritan. Mahlendorf testified that he slotted H&S' bid into the plumbing and HVAC tickets, which is reflected in the bid-day spreadsheet. Although Weitz disjunctively listed the major subcontractors in its bid to Good Samaritan, the evidence shows that Weitz actually relied on H&S' bid. Both Kennedy and Mahlendorf testified that Weitz' $9.2 million base bid incorporated H&S' base bid of $2,430,600.

We further conclude that Weitz' reliance on H&S' bid was reasonable. The evidence shows that general contractors customarily rely on subcontractors' bids. Mahlendorf testified that it was "very rare" for a subcontractor to refuse to honor its bid. In particular, Weitz had worked with H&S 10 or 15 times before without incident. Weitz' reliance was also reasonable because it had only 15 minutes to review H&S' bid.[11] Weitz could not independently verify every item in H&S' bid in a quarter of an hour. How could competitive bidding function at all if general contractors *did not* rely on subcontractors' bids?

---

[9] *Pavel v. A.S. Johnson*, 342 Md. 143, 674 A.2d 521 (1996).

[10] See *Cass County Bank v. Dana Partnership*, 275 Neb. 933, 750 N.W.2d 701 (2008).

[11] See *id.*

H&S marshals a number of arguments why Weitz did not reasonably rely on its bid, which we consolidate into five that merit discussion. First, H&S argues that the bidding documents "absolutely precluded any reliance."[12] Specifically, H&S emphasizes that Good Samaritan had the right to veto subcontractors.

But the bare fact that Good Samaritan could have, in theory, rejected H&S' bid did not make Weitz' reliance on H&S' bid unreasonable. Good Samaritan did not object to any of Weitz' subcontractors. Mahlendorf testified that despite an owner's reservation of the right to veto subcontractors, owners generally do not exercise that right "[i]n the real world." If the chance that Good Samaritan would nix H&S were significant, Weitz' reliance on H&S' bid might not have been reasonable. But the record lacks this evidence.

We similarly reject H&S' second argument, which is that Weitz' reliance was unreasonable because Weitz "did not require any quotation be kept open for any period of time as a precondition to its consideration."[13] General contractors customarily rely on subcontractors' bids, as discussed above, and the record lacks any evidence that prudent general contractors turn away bids that do not have such a provision. We cannot find any authority that conditions promissory estoppel, as a matter of law, on a demand by the general contractor that subcontractors insert such clauses into their bids. The only case that H&S cites is from a jurisdiction that allowed parties to use promissory estoppel only as a defense.[14] That case is an outlier.[15]

---

[12] Brief for appellant at 23.

[13] *Id.* at 22.

[14] See *Home Electric Co. v. Hall and Underdown Heating and Air Cond. Co., supra* note 4.

[15] See Joseph C. Kovars & Michael A. Schollaert, *Truth and Consequences: Withdrawn Bids and Legal Remedies*, 26 Constr. Law. 5 (Summer 2006).

H&S' third argument is that Weitz did not reasonably rely on its bid because it could have pulled out of the project without any consequences. H&S notes that, although the invitation to bid required Weitz to hold its bid open for 60 days, Good Samaritan did not ask for a bid security. Furthermore, Weitz knew that H&S had cold feet before Weitz and Good Samaritan formally signed a contract.

But H&S could not expect Weitz to abandon the project because H&S decided its bid was too low. Weitz promised Good Samaritan that it would hold its bid open for 60 days, and breaking that promise would have sullied Weitz' reputation. In particular, Good Samaritan might have been reluctant to work with Weitz again. Losing Good Samaritan's business would have been a significant loss to Weitz because Weitz and Good Samaritan are both active in the retirement living market. Pulling out of the project would also have jeopardized Weitz' preexisting relationship with the project architect. Good Samaritan selected the prequalified general contractors based, in part, on the architect's recommendations. Weitz did not have to tell Good Samaritan that, as things turned out, it would not build the facility because of a squabble with a plumbing and HVAC subcontractor.

The fourth reason why, according to H&S, Weitz did not reasonably rely on its bid is that Weitz "attempted to accept quotations on materially different terms."[16] H&S argues, restated, that Weitz did not rely on its subcontractors' bids, because it later asked subcontractors to sign a subcontract that did not mirror the terms of the subcontractors' bids. H&S backed out before Weitz could send it a subcontract. But H&S suggests that Weitz would have sent it a subcontract similar to the one that Weitz sent to its other subcontractors and that this hypothetical subcontract would have been materially different from H&S' bid.

---

[16] Brief for appellant at 16.

[7,8] A general contractor can reasonably rely on a subcontractor's bid even if the general contractor and subcontractor contemplate signing a formal subcontract with additional standard terms after the bidding process ends.[17] But a general contractor cannot demand that a subcontractor agree to unusual and onerous terms while still holding the subcontractor to its original bid.[18] For example, in *Hawkins Constr. Co. v. Reiman Corp.*,[19] a general contractor demanded that a subcontractor agree to multiple "nonstandard additional conditions which could be considered onerous." After the subcontractor refused to accept the terms, the general contractor tried to enforce the subcontractor's bid under promissory estoppel. We held that the general contractor's reliance was not reasonable because it could not assume that the subcontractor would acquiesce to onerous nonstandard terms.

But differences between a subcontractor's bid and the subcontract do not matter if they are an "afterthought" raised by a subcontractor that wants to avoid its promise for other reasons.[20] Here, H&S reneged because its bid was too low, and it did so before Weitz sent it a subcontract. So, H&S' dispute with the terms of the subcontract is even less than an afterthought: It is imaginary. Plus, Sieck testified that Weitz had always accepted H&S' revisions to the subcontract.

---

[17] See, *Preload Technology v. A.B. & J. Const. Co., Inc.*, 696 F.2d 1080 (5th Cir. 1983); *Debron Corp. v. National Homes Construction Corp.*, 493 F.2d 352 (8th Cir. 1974); *Saliba-Kringlen Corp. v. Allen Engineering Co.*, 15 Cal. App. 3d 95, 92 Cal. Rptr. 799 (1971).

[18] *APAC-Southeast, Inc. v. Coastal Caisson Corp.*, 514 F. Supp. 2d 1373 (N.D. Ga. 2007); *Haselden-Langley Const. v. D.E. Farr*, 676 P.2d 709 (Colo. App. 1983).

[19] *Hawkins Constr. Co. v. Reiman Corp.*, 245 Neb. 131, 136, 511 N.W.2d 113, 117 (1994).

[20] *Reynolds v. Texarkana Construction Co.*, 237 Ark. 583, 586, 374 S.W.2d 818, 820 (1964).

Finally, we reach H&S' fifth argument as to why Weitz did not reasonably rely on its bid: It was so low that Weitz was on notice that H&S had made mistakes. Differences between the scope of H&S' bid and the scopes of the other bids make a dollar-for-dollar comparison difficult, but H&S asserts that its bid was "considerably lower" than the those of its rivals.[21]

[9] We conclude that H&S' bid was not so low that Weitz' reliance on it was unreasonable. If a bid is so low that a mistake should be apparent, a general contractor cannot reasonably rely on the bid.[22] But H&S' bid was higher than what Weitz had budgeted based on historical data. Furthermore, the market for construction services was weak in 2011 and subcontractors were bidding aggressively. Kennedy and Mahlendorf testified that bids during this period could be unusually low compared to years in which the market was more robust.[23] H&S sent its bid to all four of the prequalified general contractors. Two of the general contractors, including Weitz, chose H&S without first checking to see if H&S had made a mistake.

So, H&S' bid was a promise on which reliance was foreseeable and Weitz reasonably relied on the bid. One question remains: Did the court have to enforce H&S' bid to prevent injustice?

### (c) Enforcement of H&S' Bid Was
### Necessary to Prevent Injustice

We conclude that the court could avoid injustice only by enforcing H&S' bid. As discussed above, many courts

---

[21] Brief for appellant at 30.

[22] See, e.g., *Diede Const. v. Monterey Mechanical Co.*, 125 Cal. App. 4th 380, 22 Cal. Rptr. 3d 763 (2004); Stein, *supra* note 4.

[23] See *Powers Constr. Co., Inc. v. Salem Carpets, Inc.*, 283 S.C. 302, 322 S.E.2d 30 (1984).

have recognized the unfairness of allowing a subcontractor to renege after the general contractor has relied on the subcontractor's bid in the general contractor's own successful bid to the owner. H&S argues that it is not fair to enforce its bid, because it made mistakes. But Weitz should not have to bear the cost of H&S' errors: "As between the subcontractor who made the bid and the general contractor who reasonably relied on it, the loss resulting from the mistake should fall on the party who caused it."[24]

H&S argues that we should not enforce its bid, because Weitz engaged in the "unethical practice of bid shopping."[25] A general contractor bid shops by taking the lowest subcontractor's bid to other subcontractors and asking them to undercut it.[26] Courts are reluctant to use promissory estoppel if the general contractor bid shopped, either because bid shopping shows that the general contractor did not rely on the bid, or because injustice no longer requires enforcement of the bid, or both.[27]

But the record does not show that Weitz shopped H&S' bid. Sieck testified that he had "bitter feelings" about an

---

[24] *Drennan v. Star Paving Co., supra* note 5, 51 Cal. 2d at 416, 333 P.2d at 761.

[25] Brief for appellant at 19.

[26] See, *Preload Technology v. A.B. & J. Const. Co., Inc., supra* note 17; *Constructors Supply v. Bostrom Sheet Metal Works*, 291 Minn. 113, 190 N.W.2d 71 (1971); 1 E. Allan Farnsworth, Farnsworth on Contracts § 3.25 (3d ed. 2004).

[27] See *Preload Technology v. A.B. & J. Const. Co., Inc., supra* note 17; *Complete Gen. Constr. Co. v. Kard Welding*, 182 Ohio App. 3d 119, 911 N.E.2d 959 (2009); *Pavel v. A.S. Johnson, supra* note 9; Michael L. Closen & Donald G. Weiland, *The Construction Industry Bidding Cases: Application of Traditional Contract, Promissory Estoppel, and Other Theories to the Relations Between General Contractors and Subcontractors*, 13 J. Marshall L. Rev. 565 (1980). But see *Saliba-Kringlen Corp. v. Allen Engineering Co., supra* note 17.

earlier project in which Weitz bid shopped. That project, how-ever, involved a bidding process different from the competitive process used by Good Samaritan. The only direct evidence that Weitz bid shopped during the Beatrice project is Sieck's testimony about Mahlendorf's aside about "shopping" in Beatrice. Mahlendorf did not remember making that statement. He testified that Weitz had no intent to shop H&S' bid. In a credibility battle, Mahlendorf has the better of the admittedly bitter Sieck, who candidly testified about "toying with" his memory of the communications between H&S and Weitz.

In conclusion, H&S' bid was a promise on which reliance was foreseeable. Weitz actually and reasonably relied on the bid. And justice required the court to enforce H&S' bid. So the court did not err by entering a judgment for Weitz on its promissory estoppel claim.

## 2. Damages

H&S does not agree with the amount of damages. It argues that the court erred by "awarding benefit of the bargain / contract damages rather than reliance damages."[28] H&S further contends that Weitz did not prove its damages with reasonable certainty and that its damages are necessarily zero, because Good Samaritan did not ask for a bid security.

[10,11] No single measure of damages applies in every promissory estoppel case.[29] The commentary to the Restatement (Second) of Contracts[30] explains that the ultimate standard for enforcing the promise—the prevention of injustice—also

---

[28] Brief for appellant at 18.

[29] See, e.g., *Dynalectric v. Clark & Sullivan Construct.*, 127 Nev. 480, 255 P.3d 286 (2011); 3 Eric Mills Holmes, Corbin on Contracts § 8:8 (Joseph M. Perillo ed., rev. ed. 1996).

[30] See Restatement, *supra* note 4, § 90 & comment *d*. See, also, Restatement (Second) of Contracts § 349, comment *b*. (1981).

guides the measurement of damages. The damages that the promisor ought to pay are those that justice requires.[31] In some cases, justice requires only reliance damages.[32]

For example, we approved of reliance damages in *Rosnick v. Dinsmore*.[33] There, we held that contract law's "definiteness" requirement does not apply to promissory estoppel.[34] To explain this distinction, we stated that promissory estoppel provides for damages as justice requires, rather than damages based on the benefit of the bargain.[35] In the "usual" case, we anticipated that courts would award damages measured by the promisee's reliance.[36] We note that if a promise is indefinite, the theoretical availability of damages measured by the promise's value might be moot.[37]

We did not limit damages to the extent of the promisee's reliance in *every* promissory estoppel case. As we said in *Rosnick*, promissory estoppel provides for damages as justice requires. Remedial flexibility is consistent with promissory estoppel's equitable roots.[38] Justice does not require the same measure of damages in every context.

---

[31] See, *Dynalectric v. Clark & Sullivan Constuct., supra* note 29; *US Ecology, Inc. v. State*, 129 Cal. App. 4th 887, 28 Cal. Rptr. 3d 894 (2005); *Hunter v. Hayes*, 533 P.2d 952 (Colo. App. 1975).

[32] See, e.g., *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69 (2d Cir. 1989). But see *Skebba v. Kasch*, 297 Wis. 2d 401, 724 N.W.2d 408 (Wis. App. 2006).

[33] *Rosnick v. Dinsmore*, 235 Neb. 738, 457 N.W.2d 793 (1990). See, also, *Goff-Hamel v. Obstetricians & Gyns. P.C.*, 256 Neb. 19, 588 N.W.2d 798 (1999).

[34] *Rosnick v. Dinsmore, supra* note 33, 235 Neb. at 749, 457 N.W.2d at 800.

[35] *Id.* But see *Garwood Packaging, Inc. v. Allen & Co., Inc.*, 378 F.3d 698, 703 (7th Cir. 2004) (calling premise in *Rosnick v. Dinsmore, supra* note 33, "mistaken").

[36] *Rosnick v. Dinsmore, supra* note 33, 235 Neb. at 749, 457 N.W.2d at 800.

[37] See Mary E. Becker, *Promissory Estoppel Damages*, 16 Hofstra L. Rev. 131 (1987).

[38] See *deNourie & Yost Homes v. Frost, supra* note 1.

In the construction bidding context, courts have "consistently and uniformly" measured the general contractor's damages as the difference between the reneging subcontractor's bid and the amount the general contractor paid to replacement subcontractors.[39] Here, the court measured Weitz' damages in a consistent manner. It is "plain that justice required this measure of damages."[40]

[12] We reject H&S' argument that Weitz did not prove its damages with enough exactitude. A plaintiff's burden is to prove his or her damages to a reasonable certainty, not beyond all reasonable doubt.[41] Nor were Weitz' damages zero simply because Good Samaritan did not ask for a bid security. As we explained above, H&S could not demand that Weitz walk away from the project because H&S was unhappy with its bid.

### 3. ELECTION OF REMEDIES

[13,14] Finally, H&S waived its argument that the court should have required Weitz to elect between its contract and promissory estoppel claims. The election of remedies doctrine is an affirmative defense.[42] A party must specifically plead an

---

[39] *Dynalectric v. Clark & Sullivan Construct., supra* note 29, 127 Nev. at 486, 255 P.3d at 290. See, *Preload Technology v. A.B. & J. Const. Co., Inc., supra* note 17; *Janke Const. Co., Inc. v. Vulcan Materials Co.*, 527 F.2d 772 (7th Cir. 1976); *Matherne Contractor v. Grinnell Fire Protec. Sys., supra* note 4; *Double AA Builders v. Grand State Const.*, 210 Ariz. 503, 114 P.3d 835 (Ariz. App. 2005); *Riley Bros. Constr., Inc. v. Shuck*, 704 N.W.2d 197 (Minn. App. 2005); *Alaska Bussell Elec. v. Vern Hickel Const.*, 688 P.2d 576 (Alaska 1984); Becker, *supra* note 37; Kovars & Schollaert, *supra* note 15; Comment, *Once More into the Breach: Promissory Estoppel and Traditional Damage Doctrine*, 37 U. Chi. L. Rev. 559 (1970).

[40] *Dynalectric Co. v. Clark & Sullivan Construct., supra* note 29, 127 Nev. at 487, 255 P.3d at 291.

[41] See *Dutton-Lainson Co. v. Continental Ins. Co.*, 279 Neb. 365, 778 N.W.2d 433 (2010).

[42] *Porter v. Smith*, 240 Neb. 928, 486 N.W.2d 846 (1992).

affirmative defense for the court to consider it.[43] H&S did not specifically plead election of remedies as a defense, so we will not consider it.

## VI. CONCLUSION

We affirm the judgment for Weitz on its promissory estoppel claim. H&S' bid was a promise, and it should have foreseen that Weitz, as was usual in the construction industry, might rely on the bid. Weitz reasonably relied on the bid by incorporating it in Weitz' own bid to the project owner. And the court could avoid injustice only by enforcing H&S' bid. We further conclude that the court correctly measured Weitz' damages.

AFFIRMED.

MILLER-LERMAN, J., not participating.

---

[43] See *Linscott v. Shasteen*, 288 Neb. 276, 847 N.W.2d 283 (2014). See, also, Neb. Ct. R. Pldg. § 6-1108(c).