784 N.W.2d 437 (2010)
280 Neb. 111
Donald HOOPER and Marilyn Hooper, husband and wife, appellees,
v.
FREEDOM FINANCIAL GROUP, INC., et al., appellants.
No. S-09-796.
Supreme Court of Nebraska.
June 25, 2010.
*439 Jerry W. Katskee and Rubina S. Khaleel, of Katskee, Henatsch & Suing, Omaha, for appellants.
Clifford T. Lee, of Rasmussen & Mitchell, Omaha, for appellees.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
STEPHAN, J.
Following a bench trial, the district court for Douglas County found Freedom Financial Group, Inc. (FFG), J. Patrick Pierce (Pierce), Carolyn K. Pierce (Carolyn), and Westley M. Pierce (Westley) jointly and severally liable to Donald Hooper and Marilyn Hooper for violations of *440 the Securities Act of Nebraska.[1] FFG and the Pierces appeal from that judgment. We affirm.

I. BACKGROUND
Prior to 2003, Pierce; his wife, Carolyn; and their son, Westley, were principals in a group of interrelated corporations which included Freedom Group, Inc., and its six subsidiaries, two of which were Freedom Financial, Inc., and FFG. These companies were headquartered on a multiacre tract in Omaha which also included the residence of Pierce and Carolyn, as well as an equestrian center which Pierce and Carolyn operated.
Freedom Financial was a Nebraska corporation registered with the Securities and Exchange Commission (SEC) as a broker-dealer of securities. It sold various financial products to the public through registered representatives located in 125 offices. As a broker-dealer, Freedom Financial was responsible for performing the due diligence process for financial products to be sold by its registered representatives. The Pierces were all directors of Freedom Financial and were responsible for establishing the policies and procedures of the company and for ensuring general compliance with such policies. Pierce was the president of Freedom Financial.
FFG was formed in February 2001 as a holding company for the purpose of acquiring a trust company and other financial entities. Pierce was an officer and director of FFG, and Westley was a director.
Michael Casper was the owner and president of Capital Equity Fund, Inc. (CEF), and a principal in other companies. The Freedom Group entities began a relationship with Casper in 2001, in connection with a stock offering by a company in which Casper had an interest. Although Freedom Financial was initially involved in the offering, it withdrew its participation due to concerns about the offering's compliance with securities regulations.
Around the same time, FFG announced a private placement stock offering in which it sought $10 million in capital to acquire a trust company and other financial entities. After some FFG stock had been sold, Olde South Trust, Inc., in which Casper had an ownership interest, made an offer to purchase $15 million of FFG stock under a new private offering. FFG and Olde South Trust signed a funding agreement in June 2001. But in August 2001, FFG signed a new funding agreement with Ambassador Trust, Inc., in which Casper also had an interest. Ambassador Trust agreed to provide FFG with $15 million in capital prior to the end of 2001 so that FFG could acquire a bank and a trust company. FFG and Ambassador Trust also entered into a separate funding agreement whereby Ambassador Trust agreed to provide FFG with an additional $10½ million so that FFG could acquire a second financial company to operate as a clearing broker-dealer. These agreements replaced the original FFG agreement with Olde South Trust. By the end of 2001, Ambassador Trust had not provided any of the promised funds, and FFG used other funds to complete its acquisition of a South Dakota trust company, which became Presidents Trust Company, LLC. In 2002, Ambassador Trust provided FFG and Presidents Trust Company with $310,000 pursuant to additional funding agreements executed in March, April, and May of that year.
In late 2001, Freedom Financial entered into an agreement with Casper regarding *441 the private placement offering for preferred stock of CEF, a Tennessee corporation organized in 2001 to engage primarily in the business of charged-off consumer debt receivables. Casper held 80 percent of the common stock of CEF and served as its president and one of its directors. Freedom Financial served as the "Broker/Dealer Manager" for the offering. The CEF preferred stock was not registered with the SEC or any state securities commission. Pierce testified that there are specific requirements for this type of offering, including that all investors be accredited, meaning that each investor had $1 million in net worth or met other specified criteria.
In its role as the managing broker-dealer for the CEF offering, Freedom Financial was responsible for (1) approving broker-dealers involved with the sale, including reviewing representatives to make sure they had the necessary license to sell the CEF stock; (2) reviewing advertising and promotional literature used to market the CEF offering; and (3) reviewing information on proposed investors to ensure they met the requirements necessary to purchase the CEF stock. Pierce testified that Freedom Financial exercised due diligence in reviewing the CEF offering prior to agreeing to be the managing broker-dealer. While the record suggests that CEF was responsible for preparing its marketing brochure and private placement memorandum, Pierce or other representatives of Freedom Financial reviewed the materials prior to their use in the CEF offering. The CEF offering became effective in October 2001.
At the time of the CEF offering, Heartland Financial Group was an Omaha investment and insurance firm, whose employees, Carl Wyllie and Jerry Dickinson, were also registered representatives of Freedom Financial. The Hoopers purchased CEF stock through Wyllie and Dickinson on March 28, 2002. Prior to the sale, the Hoopers provided Wyllie with information about their finances and their past experience with investing, which was mostly limited to Donald's retirement fund. That fund, then valued at $105,000, represented approximately 25 percent of the Hoopers' combined net worth. After reviewing the financial information, Wyllie ultimately recommended that the Hoopers invest Donald's retirement fund account in CEF stock.
Wyllie gave the Hoopers a marketing brochure which described the CEF stock as having "[n]o stock market risk"; as being "[s]uitable for investing by qualified and retirement plans, including IRA, 401(k), and 403(b)"; and as a "great investment vehicle for seniors." Wyllie told the Hoopers that they were getting "beat up" in the stock market and that CEF provided a more stable, safer investment and a better return than their previous investments. Wyllie also stated that the CEF stock would provide a guaranteed 11-percent rate of return over a 3-year period, and a 9-percent return if the stock were sold earlier. Dickinson was present during this discussion.
Wyllie also provided the Hoopers with the private placement memorandum for CEF. Donald testified that he did not read the materials but stated that Wyllie reviewed the documents with him. Marilyn testified that she reviewed the information on the risk factors associated with the CEF stock as described in the private placement memorandum but relied on Wyllie, who equated the risk with that of a savings account. There was never any discussion between the Hoopers and Wyllie or Dickinson about the connection between Freedom Financial, FFG, Presidents Trust Company, or CEF. The Hoopers authorized Wyllie to transfer the *442 entire balance of $105,000 from Donald's existing retirement account to invest in the CEF stock. Due to a surrender fee in connection with the transfer, the Hoopers' initial investment was reduced to $94,000.
In conjunction with the investment, Dickinson asked Donald to sign numerous documents, including a "Prospective Investor Questionnaire." Donald signed or initialed the documents where Dickinson had indicated, despite the fact that the questionnaire had not been completed. Dickinson told the Hoopers that he would fill in the necessary information. The Hoopers did not review the completed application documents until after they were notified about problems with the CEF stock in May 2003. At this time, they realized that information regarding their net worth, investment experience, and risk tolerance was misstated to make them appear to be accredited investors. Pierce testified that the application documents were completed when received by Freedom Financial and that the company had no reason to suspect that the Hoopers had not completed the application.
The Hoopers did not receive dividends from the CEF stock they purchased, nor did they receive regular financial reports. They received a letter in January 2003 from Casper, which stated that even though 2002 was a "difficult time for all participants in the investment markets" and CEF "experienced [its] share of disappointment," the portion of CEF funds invested in distressed debt portfolios had performed "pretty much as expected."
Sometime in 2002, Freedom Financial resigned as the managing broker-dealer for the CEF stock offering. Pierce testified that Freedom Financial resigned in part because of sales made by representatives not approved by Freedom Financial. Pierce also testified that Freedom Financial stopped CEF sales because of concerns that funds raised from the CEF offering were being sent to FFG through the funding agreement and because Freedom Financial was concerned about sales to unaccredited investors. Pierce initially claimed that on March 11, 2002, he sent a resignation letter and a cease-and-desist order on all CEF sales by Freedom Financial representatives. However, upon a review of telephone records, Pierce testified the next day that Freedom Financial withdrew as managing broker-dealer on March 11 but did not order CEF sales halted until June 7. Pierce also claimed that he issued a disgorgement order for all money invested in CEF so it could be returned to investors.
In April 2003, Freedom Financial, FFG, and their parent, Freedom Group, filed suit against Casper and his various entities, including CEF, for breach of contract, common-law fraud, and conversion. The Hoopers received a letter from Heartland Financial Group, dated May 8, 2003, stating that there was a potential problem with the CEF offering, including "some alleged misconduct." The letter indicated that Freedom Financial had filed a lawsuit against CEF. In June, Freedom Financial invited the Hoopers to join the lawsuit by signing a participation agreement, which would have waived any claim against any of the Freedom Group entities. The Hoopers participated in a conference call with Freedom Financial's legal counsel, but they chose not to sign the agreement. Portions of the suit were eventually dismissed by the court, and the remaining portion was voluntarily dismissed by the plaintiffs. On or about August 18, CEF redeemed all of the Hoopers' stock for $44,810.70.
Also in 2003, the various Freedom Group companies were the subjects of an investigation by the SEC which ultimately *443 led to the cessation of business by all Freedom Group companies. At issue in the investigation was a product designed and sold by Presidents Trust Company, known as the "Fixed Income Trust." The SEC determined that the Fixed Income Trust was an unregistered security, sold in violation of federal regulations, and began an investigation into all Freedom Group entities and offerings. In 2004, as part of a settlement with the SEC, Pierce consented to an order barring him from associating with any broker, dealer, or investment advisor.
The Hoopers initiated an arbitration proceeding against Freedom Financial, Heartland Financial Group, Wyllie, and Dickinson with respect to their CEF investment. In 2004, they received an arbitration awarding the amount of $83,214.70, allocated among the various parties to the arbitration proceeding.
In 2005, the Hoopers filed the present action against FFG and the Pierces. Other original defendants, including CEF, were dismissed from the case and are not parties to the appeal. The Hoopers' claim against FFG and the Pierces is based upon alleged violations of the Securities Act of Nebraska in connection with the CEF stock transaction. Following trial, the district court found that FFG and the Pierces were jointly and severally liable to the Hoopers under the provisions of § 8-1118. The court further found that the Hoopers sustained damages in the amount of $88,942.39, calculated on the basis of the initial investment of $105,000, less the redemption proceeds of $44,810.70 plus interest. Judgment for this amount, together with costs and attorney fees to be determined at a later date, was entered against FFG and the Pierces. Following additional hearings, pursuant to the Hoopers' request for attorney fees and posttrial motions filed by FFG and the Pierces, the district court determined the Hoopers' attorney fees to be $29,617.46 and entered judgment in this additional amount. FFG and the Pierces (hereinafter appellants) then commenced this timely appeal.

II. ASSIGNMENTS OF ERROR
Appellants generally assign, consolidated and restated, that the trial court erred (1) in finding that appellants violated § 8-1118, (2) by not requiring the Hoopers to provide expert testimony, and (3) in its calculation of damages. Appellants also assign as error various factual findings of the court.

III. STANDARD OF REVIEW
In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony.[2] An appellate court will not reevaluate the credibility of witnesses or reweigh testimony but will review the evidence for clear error.[3] Similarly, the trial court's factual findings in a bench trial of an action at law have the effect of a jury verdict and will not be set aside unless clearly erroneous.[4] In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence.[5]
*444 When an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent, correct conclusion irrespective of the determination made by the court below.[6]

IV. ANALYSIS

1. LIABILITY UNDER SECURITIES ACT OF NEBRASKA
The Securities Act of Nebraska (hereinafter the Act) is modeled after the 1956 Uniform Securities Act.[7] This court has stated that the Act "should be liberally construed to afford the greatest possible protection to the public."[8] The Act provides:
It shall be unlawful for any person to offer or sell any security in this state unless (1) such security is registered by notification under section 8-1105, by coordination under section 8-1106, or by qualification under section 8-1107, (2) the security is exempt under section 8-1110 or is sold in a transaction exempt under section 8-1111, or (3) the security is a federal covered security.[9]
Civil liability for violation of the Act is governed by § 8-1118, which provides in pertinent part:
(1) Any person who offers or sells a security in violation of section 8-1104 or offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they are made not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he or she did not know and in the exercise of reasonable care could not have known of the untruth or omission, shall be liable to the person buying the security from him or her. . . .
We have interpreted the phrase "[a]ny person who . . . sells" as used in § 8-1118(1) to include one who does not actually transfer title to a security, but who solicits its purchase, "motivated at least in part by desire to serve his or her own financial interests or those of the securities owner."[10]
Although Freedom Financial is not a party to this case, the district court found that it "offered or sold unregistered securities in Nebraska and sold securities by means of untrue statements of material fact and omissions to state a material fact," in violation of § 8-1118(1). Appellants' liability was predicated on this finding pursuant to § 8-1118(3), which provides in pertinent part:
(3) Every person who directly or indirectly controls a person liable under subsections (1) and (2) of this section, including every . . . director, or person occupying a similar status or performing similar functions of a partner, limited liability company member, officer, or director. . . shall be liable jointly and severally with and to the same extent as such person, unless able to sustain the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence *445 of the facts by reason of which the liability is alleged to exist.
The district court found that the Pierces were directors of Freedom Financial and that they did not meet their burden of proving that they did not know, and in the exercise of reasonable care could not have known, of the facts upon which Freedom Financial's liability was based. The court further determined that FFG directly or indirectly controlled Freedom Financial and that it likewise did not meet its burden of proving that it did not know, and in the exercise of reasonable care could not have known, of such facts.

(a) Expert Testimony Not Required
We find no merit in appellants' argument that the district court erred in not requiring proof by expert testimony regarding the standard of care applicable to investment advisors. This is not a professional negligence case, and the Hoopers were not required to prove a standard of care. To establish statutory civil liability under the Act, the Hoopers were required to prove only that Freedom Financial violated § 8-1118(1) by offering or selling an unregistered security which was required by law to be registered, or by selling a security by means of an untrue statement or omission of a material fact, and that appellants had derivative liability under § 8-1118(3). No expert testimony was required to prove the facts necessary to establish this statutory liability.

(b) Violation of § 8-1118(1) by Freedom Financial
The district court found that Freedom Financial violated § 8-1118(1) in two ways: (1) by selling unregistered securities and (2) by selling the CEF stock by means of untrue statement of material facts and omissions of facts. Appellants do not assign error to the finding that Freedom Financial "offered or sold unregistered securities." And the record supports the finding. In their federal lawsuit against Casper and others, Freedom Financial, FFG, and Freedom Group alleged that "Freedom Financial sold $1,433,788.91 of the preferred stock of CEF to its clients." It is undisputed that the CEF stock was unregistered, and there is no claim on appeal that the stock itself or the transaction in which it was sold to the Hoopers had retained its purported exempt status.[11] Likewise, there is undisputed evidence that the CEF stock was recommended and sold to the Hoopers by registered representatives of Freedom Financial. We note that the findings of the district court incorrectly identify Wyllie and Dickinson as registered representatives of "Freedom Financial Group, Inc.," but it is clear from Pierce's testimony that they were, in fact, registered representatives of Freedom Financial. There is evidence that Freedom Financial had a financial interest in the transaction, in that it was to receive a commission on the sale of the CEF preferred stock and a related entity, FFG, received financing from CEF through the proceeds of the offering.
We find no merit in appellants' argument that the district court erred in finding that the stock was sold by means of "untrue statements of material facts and omissions of fact."[12] The evidence establishes that the stock was sold by means of the untrue statements contained in the marketing brochure approved by Freedom Financial and provided to the Hoopers by Wyllie and Dickinson, who reinforced the untrue statements regarding risk, return, and suitability in the sales pitch and *446 recommendations they made to the Hoopers. It is likewise clear that the Hoopers were unsophisticated investors who relied upon Wyllie's assurances that the CEF stock was as described in the sales pamphlet, notwithstanding its inconsistencies with the offering memorandum. Thus, the evidence, considered under our standard of review, is sufficient to support the finding that Freedom Financial violated § 8-1118(1) both by selling unregistered securities in violation of § 8-1104 and by means of untrue statements and concealment of material facts.

(c) Liability of Directors and FFG Under § 8-1118(3)
It is undisputed that at all relevant times, each of the three Pierce defendants were directors of Freedom Financial, and that Pierce served as president of the corporation. As such, they were responsible for establishing the policies and procedures of the company and for ensuring general compliance with such policies. Under Nebraska's Blue-Sky Law,[13] which preceded the Act, we held that officers and directors of a corporation which violated the law were subject to statutory civil liability, regardless of their direct participation in the sale, if they knew, or in the exercise of reasonable care could have known, of the facts upon which liability was based.[14] This principle is now codified in § 8-1118(3). Although we have not previously addressed the liability of officers and directors under the Act, courts in other states have construed similar adaptations of the Uniform Securities Act to impose strict liability on officers and directors unless the statutory defense of lack of knowledge is proved.[15] We construe § 8-1111(3) in the same manner.
There is ample evidence to support the district court's finding that, as directors, Pierce, Carolyn, and Westley did not meet their burden of proving that they did not know, and in the exercise of reasonable care could not have known, of the facts upon which Freedom Financial's liability was based. Carolyn and Westley did not testify and thus provided no evidence on this point. There is nothing in the record to suggest that they did not have access to information concerning Freedom Financial's involvement in the CEF offering. Pierce testified that he was personally involved in the offering on behalf of Freedom Financial, that he knew the stock was not registered, and that his office reviewed the marketing brochure which contained the untrue and misleading statements about the stock. Pierce gave conflicting testimony about when he first learned that FFG was receiving funds from the proceeds of the CEF offering, and the district court found that his testimony on this point was not credible.
Likewise, there is competent evidence to support the finding of the district court that FFG controlled Freedom Financial by ensuring its ongoing participation in the CEF offering which was intended to provide financing for FFG's planned acquisitions and that FFG did not meet its burden of proving that it did not know, and in the exercise of reasonable care could not have known, of the facts upon which Freedom *447 Financial's liability was based. FFG and Freedom Financial were subsidiaries of the same parent corporation. Pierce served as an officer and director of both subsidiary corporations as well as the parent corporation. He was personally involved in the companies' transactions involving CEF and other entities controlled by Casper. The evidence supports a reasonable inference that FFG was an active participant in a plan whereby Freedom Financial would serve as managing broker-dealer of the CEF stock offering in order to generate funds through which CEF or other Casper entities would provide financing for FFG.

2. DAMAGES
One who purchases securities sold in violation of the Act may sue
to recover the consideration paid for the security, together with interest at six percent per annum from the date of payment, costs, and reasonable attorney's fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security. Damages shall be the amount that would be recoverable upon a tender less (a) the value of the security when the buyer disposed of it and (b) interest at six percent per annum from the date of disposition.[16]
Appellants contend that the district court erred in determining the amount of the Hooper's original investment to be $105,000. They argue that the amount was less than that amount because of a surrender fee incurred when Donald's retirement account was liquidated in order to make the CEF investment. But the district court's finding is supported by appellants' responses to requests for admission which were received in evidence. Each of the appellants admitted that the consideration paid by the Hoopers for the CEF stock was $105,000. The district court relied upon this evidence in its finding.
Appellants also contend that the damage award should have been reduced by amounts which Wyllie and Dickinson paid to the Hoopers pursuant to the arbitration award. We conclude that the record is insufficient to resolve this issue, and we therefore do not address it.

V. CONCLUSION
We have considered each of the appellants' assignments of error directed to factual findings made by the district court, and, to the extent they are necessary to the determination of liability or damages, we conclude that they are without merit. For the reasons discussed herein, we conclude that the district court did not err in finding Pierce, Carolyn, Westley, and FFG liable to the Hoopers in the amount of $88,942.39, together with taxable costs and attorney fees. We affirm the judgment.
AFFIRMED.
NOTES
[1] Neb.Rev.Stat. §§ 8-1101 to 8-1123 (Reissue 2007).
[2] Eicher v. Mid America Fin. Invest. Corp., 275 Neb. 462, 748 N.W.2d 1 (2008).
[3] Id.
[4] Id.
[5] Pick v. Norfolk Anesthesia, 276 Neb. 511, 755 N.W.2d 382 (2008); Eicher v. Mid America Fin. Invest. Corp., supra note 2.
[6] Id.
[7] See 7C U.L.A. app. I (2006). See, also, Knoell v. Huff, 224 Neb. 90, 395 N.W.2d 749 (1986) (Grant, J., dissenting).
[8] Labenz v. Labenz, 198 Neb. 548, 550, 253 N.W.2d 855, 857 (1977).
[9] § 8-1104.
[10] Wilson v. Misko, 244 Neb. 526, 538, 508 N.W.2d 238, 248 (1993).
[11] See §§ 8-1104, 8-1110, and 8-1111.
[12] Brief for appellants at 7.
[13] Neb.Rev.Stat. §§ 81-302 to 81-349 (Reissue 1958).
[14] See, Huryta v. White, 184 Neb. 24, 165 N.W.2d 354 (1969); Loewenstein v. Midwestern Inv. Co., 181 Neb. 547, 149 N.W.2d 512 (1967); Davis v. Walker, 170 Neb. 891, 104 N.W.2d 479 (1960).
[15] See, e.g., Lean v. Reed, 876 N.E.2d 1104 (Ind.2007); Taylor v. Perdition Minerals Group, Ltd., 244 Kan. 126, 766 P.2d 805 (1988).
[16] § 8-1118(1).