IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)


30 METROPOLITAN PLACE V. DANA PARTNERSHIP


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


30 METROPOLITAN PLACE, LLC, APPELLEE,

V.

DANA PARTNERSHIP, LLP, AND ARUN AGARWAL, APPELLANTS.


Filed June 27, 2023.    No. A-22-591.


Appeal from the District Court for Douglas County: JEFFREY J. LUX, Judge. Affirmed as modified.

Thomas J. Culhane, Bonnie M. Boryca, and Ryan L. Crew, of Erickson | Sederstrom, P.C., for appellants.

Gregory C. Scaglione and Kendra Vosler, of Koley Jessen, P.C., L.L.O., for appellee.


PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

30 Metropolitan Place, LLC (30 Metro), filed an action against Dana Partnership, LLP (Dana), and Arun Agarwal (Agarwal) (collectively appellants) in the district court for Douglas County alleging claims for breach of contract based on nonpayment of rent. Appellants filed an answer and counterclaim denying 30 Metro's claims and asserting, among other affirmative defenses, that 30 Metro did not have standing to bring its claims and that 30 Metro was estopped from asserting its claims of nonpayment of rent. Following a bench trial, the district court entered an order finding in favor of 30 Metro and awarding it damages, including past due rent, prejudgment interest, and costs. The district court also ordered appellants to transfer to 30 Metro the funds held in a certain bank account established by Agarwal, but titled in 30 Metro's name. Appellants appeal from the decision of the district court. Upon our review of the record, we modify

- 1 -

the amount of prejudgment interest awarded to 30 Metro, but we affirm the district court's order in all other respects.

## II. BACKGROUND

This action is focused on a Master Lease Agreement (Master Lease) relating to a mixed-use, multifamily residential and commercial building located in Omaha, Nebraska. 30 Metro is the landlord in the Master Lease and the owner of the building. Currently, 30 Metro is owned almost entirely by R4 MPNE Acquisition, LLC (R4). However, Dana initially purchased the land where the building is located. Dana is the tenant under the Master Lease. Agarwal is a member of Dana.

After Dana purchased the land where the building is located, it formed a single purpose entity, 5319 North, LLC, to hold the land. Ultimately, Dana decided to use the land for what was termed, the 30 Metro Project, a tax credit project. A tax credit project offers private individuals incentives from the federal government to build low-income housing. Clarity Development Company, LLC (Clarity), which Dana owns an interest in, was hired to be the developer of the 30 Metro Project. Clarity then became a 10 percent owner in 5319 North, which became the manager of 30 Metro. In fact, Clarity was named the managing member for 5319 North, and as such, managed 30 Metro. After Clarity obtained partial ownership in 5319 North, Dana retained the remaining 90 percent in ownership.

In December 2016, Dana and 30 Metro entered into the Master Lease. Under the terms of the Master Lease, Dana was to collect rent from the three commercial subtenants who had space in the building and pay this rent to 30 Metro. Agarwal, individually, signed a Guaranty of the Master Lease in favor of 30 Metro, guaranteeing Dana's rent obligations under the agreement. The Guaranty provided that Agarwal must pay the rent due immediately upon demand if Dana does not make its rental payments.

On April 17, 2020, 30 Metro filed a complaint alleging that Dana and Agarwal had breached their contractual obligations by failing to timely make rent payments due under the Master Lease and/or the Guaranty in 2018, 2019, and a portion of 2020. 30 Metro sought damages in the amount of $370,203.82 in unpaid rent. It also asked that it be awarded pre and post judgment interest, attorney fees, and expenses, costs, and late charges, in addition to "such other, further and different relief as this Court deems just and equitable."

In their answer, appellants denied that they had breached their obligations under either the Master Lease or the Guaranty. They also alleged multiple affirmative defenses including, unclean hands, estoppel, and 30 Metro's lack of standing to bring the suit.

A bench trial was held on April 11, 12, and 13, 2022. The evidence before the court indicated that pursuant to the Master Lease, Dana was required to make "base rent" and "additional rent" payments beginning in January 2018. These rental payments were to be paid to 30 Metro through its property manager, Seldin Company, in full "without setoff, counterclaim, abatement, suspension, deduction or defense." Beginning in January 2018 and through all relevant time periods, Dana fully collected all rent and amounts due from the subtenants of the commercial space. However, Dana did not pay to 30 Metro the base rent, additional rent, or any other amounts due under the Master Lease for all of 2018 and 2019 and January through at least the first quarter

of 2020. Appellants assert that during this time period they did make other payments directly to R4 in lieu of paying rent. Dana began paying rent to 30 Metro on May 1, 2020.

Other evidence presented at trial revealed that in June 2018, Agarwal opened an account at Mutual of Omaha Bank (now CIT Bank) in 30 Metro's name. When applying for the account, Agarwal held himself out as the manager or designated member of 30 Metro. However, Agarwal is neither. Agarwal is the only person who has the authority to withdraw funds from this account.

In February 2020, 30 Metro sent a notice of default of the Master Lease to Dana. In the notice, 30 Metro notified Dana that it had neglected to pay rent for all of 2018, all of 2019, and in January 2020. It indicated that the total amount of rent due at that time was $370,203.82. 30 Metro directed Dana to remit payment in full to its bank account at Dundee Bank within 30 days. Dana did not remit any rental payments to 30 Metro's account at Dundee Bank during the next 30 days. Additionally, Agarwal did not remit any rental payments to 30 Metro as the guarantor of Dana's Master Lease with 30 Metro. Instead, Dana and Agarwal apparently deposited into the Mutual of Omaha/CIT Bank account a portion of the amount 30 Metro had demanded in past due rent, $104,536.68. As of March 2, 2022, approximately one month prior to trial, this account had a balance of $159,470.03.

Further facts elicited during the trial will be discussed as necessary in the analysis section below.

On July 7, 2022, the district court entered an order finding in favor of 30 Metro on its breach of contract claims and against appellants on each of their affirmative defenses. In reaching its ultimate decision, the district court explicitly found that neither Agarwal nor the other witness called on behalf of appellants, Lynn Gorman, Dana's chief financial officer (CFO), were credible witnesses. The court found that Agarwal had demonstrated a tendency to provide inaccurate information "when it is convenient to achieve an end." The court also believed that Agarwal had influenced Gorman's testimony, given his status as her superior at Dana. The court awarded 30 Metro $500,367.71 in unpaid rent, which included interest charged by 30 Metro, an additional $2,134 in prejudgment interest accrued as of April 13, 2022, and $1,680.01 for taxable court costs. In addition, the court ordered appellants to "immediately transfer the entire balance of the 30 Metro account at CIT Bank f/k/a Mutual of Omaha Bank ($159,470.03), into the 30 Metro account at Dundee Bank." Those funds were to be applied as a credit against the judgment entered in favor of 30 Metro.

Appellants have timely appealed from the district court's order.

### III. ASSIGNMENTS OF ERROR

Appellants assign that the district court erred by (1) finding the testimonies of Agarwal and Dana's CFO, Gorman, to not be credible; (2) finding no valid contract had been formed on December 6, 2016, transferring Clarity's 10 percent ownership interest in 5319 North to Dana, thereby ruling that 30 Metro had authority and standing to bring this suit; (3) finding that neither promissory estoppel nor equitable estoppel was proven by appellants; (4) calculating the amount of damages and prejudgment interest that is owed to 30 Metro under the Master Lease; (5) denying the application of payments made by Dana directly to R4 as credits toward rent owed; and (6) ordering appellants to transfer the funds from the Mutual of Omaha/CIT Bank account established by Agarwal in 30 Metro's name to 30 Metro's actual bank account to partially satisfy the judgment.

## IV. STANDARD OF REVIEW

A suit for damages arising from breach of contract presents an action at law. *Bloedorn Lumber Co. v. Nielson*, 300 Neb. 722, 915 N.W.2d 786 (2018). In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Hooper v. Freedom Fin. Group*, 280 Neb. 111, 784 N.W.2d 437 (2010). An appellate court will not reevaluate the credibility of witnesses or reweigh testimony but will review the evidence for clear error. *Id.* Similarly, the trial court's factual findings in a bench trial of an action at law have the effect of a jury verdict and will not be set aside unless clearly erroneous. *Id.*; *132 Ventures v. Active Spine Physical Therapy*, 313 Neb. 45, 982 N.W.2d 778 (2022)*.* In reviewing a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Bloedorn Lumber Co. v. Nielson, supra*. However, regarding a question of law, an appellate court has an obligation to reach a conclusion independent of that of the trial court. *Id.*

## V. ANALYSIS

### 1. CREDIBILITY DETERMINATIONS

In the district court's order, it explicitly found that Agarwal was not a credible witness. In so finding, the court specifically referred to Agarwal's actions in holding himself out as a manager or designated member of 30 Metro in order to open a bank account in its name, when he was neither a manager nor a designated member of the company, and in making other such false statements when signing his name on documents for 5319 North. The court explained,

> Such testimony are examples which obviously impact the credibility of [Agarwal]'s entire testimony. [Agarwal]'s demeanor did not particularly change during these very enlightening portions of his testimony, thereby throwing the credibility of his entire testimony in question. It is apparent, at least in these two situations, that [Agarwal] certifies, authorizes, or promotes falsehoods or "inaccurate" information when it is convenient to achieve an end.

The court went on to conclude:

> As such, when [Agarwal]'s "inaccurate" information was brought to the Court's attention through his admissions during cross-examination, such conduct casts doubt on the credibility of his entire testimony and is hard to ignore. The Court finds the testimony of Arun Agarwal is not credible, and will therefore not consider it as evidence when ruling on the [appellants'] Affirmative Defenses.

The court also found the testimony of Gorman, the CFO for Dana, to not be credible. The court indicated, "The Court has also considered the credibility of the other witnesses who testified. In particular, the Court finds Lynn Gorman's testimony to be less credible. This is in part because Arun Agarwal significantly influenced and/or directed the work of Lynn Gorman in her role as CFO of Dana."

On appeal, appellants challenge the credibility determinations made by the district court. Essentially, appellants ask this court to re-evaluate the credibility of Agarwal and Gorman and come to a different conclusion than the district court. However, as we stated above, in a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Hooper v. Freedom Fin. Group*, 280 Neb. 111, 784 N.W.2d 437 (2010). As the trier of fact in a bench trial, the credibility of a witness is a question for the district court, and it is within the court's province to credit the whole of the witness' testimony, or any part of it, which seemed to it to be convincing and reject so much of it as in its judgment is not entitled to credit. See *Benjamin v. Bierman*, 305 Neb. 879, 943 N.W.2d 283 (2020). An appellate court will not reevaluate the credibility of witnesses or reweigh testimony. *Hooper v. Freedom Fin. Group, supra*.

In its order, the district court provided a very thorough and specific rationale for its determination that Agarwal and Gorman were not credible witnesses. In coming to this determination, the court had the benefit of actually hearing and observing Agarwal and Gorman testify. We do not have such benefit in our review of the bill of exceptions. As such, we give great weight to the court's finding that their testimony was not believable.

Furthermore, upon our review, there appears to be ample support for the district court's credibility findings. In particular, Agarwal was often evasive and uncooperative in answering questions. His testimony at times indicated that he understood very little about real estate transactions and contracts, but his extensive background in these areas contradicted such lack of knowledge. In addition, he made several admissions with regard to providing untrue information with respect to the 30 Metro Project and the Master Lease. His testimony at trial frequently varied from his prior deposition testimony. Similarly, Gorman's trial testimony was largely contradicted by her previous deposition testimony, without any real explanation for the discrepancies. In light of the evidence presented at trial and the district court's specific credibility findings, we find no reason to question the district court's credibility determinations regarding Agarwal and Gorman. Rather, we find support for the district court's findings.

2. STANDING BASED ON ORAL CONTRACT

At trial and on appeal, appellants assert that 30 Metro does not have standing to raise its breach of contract claim. Dana claims that the evidence established that it is the current sole owner and manager of 5319 North, and as such was empowered to manage all operations of 30 Metro since 5319 North was the managing member of 30 Metro. The district court found appellants' assertion regarding standing to lack merit. Upon our review, we find no clear error in the court's determination.

Appellants' contention as to the ownership of 5319 North was strongly disputed during the trial. 30 Metro contends that Clarity still owns a 10 percent interest in 5319 North, remains the managing member of 5319 North, and as such, remains the managing member of 30 Metro.

The dispute regarding the ownership of 5319 North can be traced back to a conversation held on December 8, 2016. Present at this conversation was Agarwal, as a member of Dana, and Tom McLeay, a member of Conservatory Park, LLC, which was the managing member of Clarity. Agarwal testified that during this December 8 conversation, McLeay learned that Clarity would not be receiving a $200,000 payment it expected at the impending closing of the 30 Metro building

project. Agarwal explained that Clarity needed this cash payment, so McLeay suggested that Clarity would return the 10 percent ownership interest it held in 5319 North if Dana would ensure that Clarity received the $200,000 payment. According to Agarwal, Dana orally agreed to this arrangement, and paid Clarity $100,000 at the time of the closing and also cancelled $100,000 in debt that Clarity owed to Dana.

During his testimony, Agarwal admitted that the proposed arrangement between Dana and Clarity was not reduced to writing because the parties did not want to disrupt the upcoming closing of the 30 Metro building project, which was only 10 days away. Agarwal also admitted that because the closing documents were not changed, at the time of closing on the project on December 15, 2016, Clarity was listed as a 10 percent owner and managing member of 5319 North. Despite these facts, Agarwal testified that from the time of closing, Dana acted as the manager for both 5319 North and 30 Metro, until a dispute arose between all the parties and Dana was told to cease acting as manager for 30 Metro. Appellants contend that, essentially, the December 8 conversation constituted a binding oral agreement between Dana and Clarity that everyone involved understood would be "papered" later. According to Agarwal, from December 8 forward, everyone involved understood that Dana would be the acting manager of 5319 North and 30 Metro.

30 Metro, on the other hand, contends that the arrangement discussed on December 8, 2016, never materialized into a binding agreement and, thus, never modified the provision that Clarity was a 10 percent owner of 5319 North and the manager of both 5319 North and 30 Metro. 30 Metro provided evidence that after closing, in order for there to have been a change in the ownership or management of either 5319 North or 30 Metro, R4 would have to provide prior written consent to the change. Greg Doble, a representative from R4, testified that R4 never gave such consent. However, Doble did indicate that R4 was aware that there were informal discussions held between Clarity and Dana regarding changing the ownership of 5319 North.

30 Metro also provided evidence to indicate that as late as June 2018, two and one-half years after closing, Dana and Clarity were still negotiating the terms of Clarity giving up its 10 percent ownership in 5319 North. At that time, Clarity indicated that it would give up its ownership interest upon the release of its corporate tax credit guaranty. However, these negotiations were never reduced to a formal written agreement. And, Clarity's tax credit guaranty was still not released at the time of trial. Additionally, in 2019, 5319 North represented on federal tax documents that Dana's ownership interest was 90 percent. Finally, Doble testified that R4, as the majority owner of 30 Metro, had fully consented to 30 Metro filing the breach of contract suit against Dana and Agarwal.

In its order, the district court found that appellants did not meet their burden of establishing that Dana and Clarity had entered into a valid, legally enforceable contract transferring Clarity's 10 percent interest in 5319 North to Dana. As such, the court stated, "Clarity remains empowered to manage all operations of 30 Metro as the manager of 5319 North. [30 Metro] has standing to bring this action." The court further explained:

> Although the Court recognizes that there is evidence of negotiations, including draft agreements and the $200,000 in value [Dana] provided to Clarity, the Court does not find that a legally binding contract was formed on December 8, 2016. Here, the greater weight of the evidence shows that the oral discussions starting on December 8, 2016, and continuing thereafter, as well as the various unsigned drafts never became "a binding legal

agreement amongst the Parties . . . executed by all Parties and acknowledged and agreed to by R4 Capital, LLC or its appropriate affiliate."

Upon our review of the record, we cannot say that the district court's finding that no legally binding contract existed which gave Dana 100 percent ownership in 5319 North after December 8, 2016, was clearly erroneous. Evidence presented at the trial supported the district court's decision. As such, 30 Metro, through its managing member, 5319 North, had standing to institute this lawsuit against Dana and Argawal.

To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract. *Ralston Investment Group v. Wenck*, 27 Neb. App. 574, 933 N.W.2d 903 (2019). A contract is not formed if the parties contemplate that something remains to be done to establish contractual arrangements or if elements are left for future arrangement. *Id.* It is a fundamental rule that in order to be binding, an agreement must be definite and certain as to the terms and requirements. *Id.*

Here, the district court found that appellants failed to meet their burden of establishing a valid and legally enforceable contract based on the December 8, 2016, conversation between Argawal, a representative of Dana, and McLeay, a representative of Clarity. The court found that after the December 8 conversations, negotiations between the parties continued and the agreement was never reduced to a formal writing which all of the interested parties, including R4, approved and signed. Given this evidence, there does not appear to have been any specific meeting of the minds, nor were the terms of the agreement definitively determined.

30 Metro presented evidence to demonstrate that the parties continued to negotiate Clarity returning its 10 percent ownership in 5319 North to Dana long after the December 2016 conversation. Moreover, based upon the continuing negotiations, Clarity asked for the removal of a tax credit guaranty it had entered into in exchange for Dana receiving its 10 percent ownership in 5319 North. The evidence demonstrated that such action had still not been taken at the time of trial, suggesting that no formal agreement between Dana and Clarity had been reached. Additionally, tax documentation from 2019, three years after the December 2016 conversation, continued to indicate that Dana only owned 90 percent of 5319 North.

Based on this evidence coupled with the district court's credibility determinations discussed above, we cannot say that the district court clearly erred in concluding that Clarity remained empowered to manage all operations of 30 Metro as the manager of 5319 North through the time of trial and accordingly, had standing to bring the current action. We do note, as did the district court, that to the extent that Dana actually paid Clarity $200,000 without receiving any benefit, such could constitute the basis for a separate action that could be filed against Clarity on Dana's behalf.

### 3. ESTOPPEL

Appellants next assign that the district court erred in determining that the theories of promissory and equitable estoppel both failed to constitute a successful affirmative defense to 30 Metro's claim for unpaid and past due rent. However, in the body of their argument section, appellants focus only on how these two equitable theories should bar Clarity from asserting that it never formalized an agreement with Dana regarding returning its 10 percent ownership interest in

5319 North. Appellants fail to provide any rationale or nexus between its apparent assertion that if it owned 100 percent of 5319 North by virtue of a promise or agreement made with Clarity, then neither Dana nor Argawal would have had to pay rent to 30 Metro under the Master Lease and/or Guaranty. Ultimately, we conclude that appellants' arguments on this topic lack any merit.

Promissory estoppel is based on a party's detrimental reliance on another party's promise that would otherwise be an unenforceable contract. See *Synergy4 Enters. v. Pinnacle Bank*, 290 Neb. 241, 859 N.W.2d 552 (2015). A claim of promissory estoppel requires a plaintiff to show: (1) a promise that the promisor should have reasonably expected to induce the plaintiff's action or forbearance, (2) the promise did in fact induce the plaintiff's action or forbearance, and (3) injustice can only be avoided by enforcing the promise. *Weitz Co. v. Hands, Inc.*, 294 Neb. 215, 882 N.W.2d 659 (2016). A plaintiff claiming promissory estoppel need not show a promise definite enough to support a unilateral contract, but it must be definite enough to show that the plaintiff's reliance on it was reasonable and foreseeable. *Id*.

Similarly, the doctrine of equitable estoppel applies where, as a result of conduct of a party upon which another person has in good faith relied to his or her detriment, the acting party is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed. *Nelssen v. Ritchie*, 304 Neb. 346, 934 N.W.2d 377 (2019). The elements of equitable estoppel are, as to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts, or at least which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts. *Id*. As to the other party, the elements are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his or her injury, detriment, or prejudice. *Id*.

Assuming, without deciding, that appellants could successfully demonstrate that either the theory of promissory or equitable estoppel would bar Clarity from asserting that it never formalized an agreement with Dana regarding returning its 10 percent ownership interest in 5319 North, such a finding would have no bearing on appellants' obligation to pay rent to 30 Metro under the Master Lease. No matter who owns and controls it, 5319 North is 30 Metro's managing member. Its role as managing member does not mean that 5319 North is synonymous with 30 Metro. They are two entirely separate legal entities. As such, even if Dana controlled 5319 North and thus became the managing member of 30 Metro, this status would not obviate Dana's obligation to pay rent to 30 Metro under the Master Lease. This is particularly true where 30 Metro is almost entirely owned by R4, not by 5319 North. Accordingly, appellants' arguments that promissory and equitable estoppel bar Clarity from denying the alleged December 8, 2016, agreement have no bearing on appellants' ongoing obligation to pay rent to 30 Metro under the Master Lease.

## 4. CALCULATING AND AWARDING UNPAID
### RENT AND PREJUDGMENT INTEREST

Appellants next assign that the district court erred in its calculation of the damages owed by appellants to 30 Metro as a result of the unpaid rent. Appellants' argument in this regard has three parts. First, appellants assert that the court erred in determining that past due rent had begun to accrue in January 2018, rather than in March 2019, when, according to appellants, the commercial subleases obtained certificates of occupancy. Second, appellants assert that the district court erred in awarding 30 Metro prejudgment interest because such an award is not permissible pursuant to the terms of the Master Lease. Third, appellants assert that even if prejudgment interest was properly awarded to 30 Metro, it should not have begun to accrue until after the notice of default was provided to appellants. We address each argument in turn.

### (a) Date Past Due Rent Began to Accrue

During the trial, 30 Metro presented evidence that under the terms of the Master Lease, Dana's obligation to pay rent was to commence on June 30, 2017, even though the commercial space was not yet completed. However, as a concession to Dana and Argawal, 30 Metro agreed not to charge Dana any rent through the end of 2017. Rent began to accrue in January 2018.

Despite the explicit terms of the lease, Argawal testified that Dana did not have any obligation to pay rent to 30 Metro until the commercial portion of the property was fully built out and ready for occupancy. He further testified that by March 2018, the core and shell of the building was completed, but the commercial space was not yet built out and ready for occupancy. There is no evidence in the record which affirmatively demonstrates when the sublessees began to occupy the commercial space. However, an email sent by a representative of the 30 Metro Project to Gorman in February 2019, indicates that the Master Lease required rental payments by Dana starting as soon as one of the sublessees received their certificate of occupancy. The email goes on to indicate that the records show that Dana did not pay rent in November and December 2018 and that such rent needs to be paid "in order for the bond to size up properly." In their brief on appeal, appellants assert that this February 2019 email proves that Dana did not have to pay rent until at least March 2019, the month after this letter was sent.

In its award of past due rent to 30 Metro, the court determined that Dana owed rent to 30 Metro under the Master Lease beginning in January 2018. We agree with the district court. The terms of the Master Lease clearly provide that rent was to begin accruing no later than January 2018. Appellants did not provide any definitive evidence to demonstrate that this term in the lease was amended or waived in any way, other than Argawal's testimony. That testimony was found not credible. In fact, the February 19 email to Gorman contradicts appellants' assertions about when the rent became due. The email clearly indicates that rent was due in 2018, because, upon discovering that rent had not been paid for November and December, 30 Metro notified Dana that no rent for those months had been received. Additionally, a list of rent due from Dana to 30 Metro prepared by Gorman in March 2020, clearly indicates that monthly rental payments began accruing in January 2018. We can find no error in the district court's reliance on the terms of the Master Lease to determine when Dana's obligation to pay rent to 30 Metro began. The court did not err in finding appellants owed rent dating back to January 2018.

(b) Award of Prejudgment Interest

In its award to 30 Metro, the district court adopted 30 Metro's calculations of the amount of past due rent owed to it. Such calculations include prejudgment interest. On appeal, appellants assert that an award of prejudgment interest is not permitted, because it is not specifically provided for in the Master Lease. 30 Metro agrees that prejudgment interest is not explicitly contemplated by the Master Lease. However, it asserts that prejudgment interest is still permissible, given 30 Metro's general reservation of rights in § 14.3 of the agreement which provides for 30 Metro's rights in the event of a default by Dana. As is relevant to the issue of prejudgment interest, § 14.3(a)(iv) of the agreement permits 30 Metro to "pursue . . . any other right or remedy available to Landlord on account of such Event of Default under this Lease and/or at law or in equity." 30 Metro then points to Neb. Rev. Stat. § 45-104 (Reissue 2021) to demonstrate that prejudgment interest is permitted under the Master Lease pursuant to Nebraska law. Section 45-104 provides:

> Unless otherwise agreed, interest shall be allowed at the rate of twelve percent per annum on money due on any instrument in writing. . . . Unless otherwise agreed or provided by law, each charge with respect to unsettled accounts between parties shall bear interest from the date of billing unless paid within thirty days from the date of billing.

Upon our review, we affirm the decision of the district court to award prejudgment interest to 30 Metro.

Awards of prejudgment interest are reviewed de novo. *AVG Partners I v. Genesis Health Clubs*, 307 Neb. 47, 948 N.W.2d 212 (2020). Section 45-104 allows for interest "on money due on any instrument in writing." The Nebraska Supreme Court has recognized that interest under § 45-104 can be recovered on a lease, although the statute's provisions may be superseded by terms set forth in the lease. See *AVG Partners I v. Genesis Health Clubs, supra*. Here, the terms of the Master Lease do not supersede the provisions of § 45-104 because the Master Lease does not explicitly provide for prejudgment interest within its terms. Thus, the question is whether prejudgment interest can be awarded pursuant to § 45-104 when the terms of the lease do not explicitly reserve the landlord's right to obtain prejudgment interest upon the tenant's default.

Given the language of § 14.3(a)(iv) of the Master Lease, we conclude that the district court's award of prejudgment interest to 30 Metro was proper. Section 14.3(a)(iv) preserves 30 Metro's right to pursue any available remedy for Dana's default in the payment of rent which is provided by Nebraska law. Nebraska law, through § 45-104, permits the recovery of prejudgment interest for money due on any instrument in writing. As such, § 45-104 permits 30 Metro to recover prejudgment interest from appellants as a result of Dana's nonpayment of rent under the Master Lease. We agree with appellants that the language of the Master Lease could have been more specific in explicitly providing 30 Metro the right to recover prejudgment interest due to the nonpayment of rent. However, the agreement does not explicitly forbid 30 Metro's recovery of prejudgment interest. And, the language of § 14.3(a)(iv) of the agreement addressing default can be read to put Dana on notice that 30 Metro may pursue remedies allowable by law other than those explicitly listed in the agreement.

Given that prejudgment interest was permitted by both the Master Lease and § 45-104, we must address appellants' assertion that the district court incorrectly calculated the amount of prejudgment interest owed to 30 Metro. In its order, the district court agreed with 30 Metro that prejudgment interest began to accrue on each missed rental payment the day after it was due. The court adopted 30 Metro's calculations of the amount owed to it and such calculations included 12 percent interest accruing from the day after each past due rental payment was to be made. Appellants contest this calculation of the amount of prejudgment interest that is due to 30 Metro given the terms of the Master Lease. They argue that prejudgment interest did not begin to accrue until after they received the notice of default from 30 Metro in February 2020, rather than one day after each missed payment. We agree with appellants on this point. According to the terms of the Master Lease, prejudgment interest did not begin to accrue until 30 days after 30 Metro sent the notice of default to appellants.

Section 14.1 of the Master Lease provides an explanation of what constitutes an "Event of Default" by the tenant, Dana. One such event of default is Dana's failure "to pay any Base Rent, Additional Rent or other sum that it is obligated to pay under this Lease, when and as it is due and payable hereunder." Section 14.2 of the Master Lease then indicates that upon the occurrence of an event of default, "Landlord shall give written notice thereof to Tenant. . . ." If such event of default is the failure to pay any rent, "Tenant shall have thirty (30) days after Landlord gives such written notice, to pay all of such money." At the end of § 14.2 of the agreement, it provides:

> Following the cure periods set forth in this Section 14.2, Landlord shall be entitled, without giving further notice to Tenant, to take any or all of the actions set forth in Section 14.3 of this Lease (each of which actions, if taken, shall be effective immediately upon the giving of a notice thereof to Tenant, unless otherwise stated in such notice).

As we discussed above, § 14.3 of the agreement provides the remedies available to 30 Metro in the event of Dana's default. Such remedies include the payment of prejudgment interest.

As we read the language of the Master Lease, 30 Metro was only allowed to pursue the remedies listed in § 14.3, including prejudgment interest, after sending written notice of default to Dana and providing it with 30 days to cure the default by paying the past due rent. The evidence presented at the trial indicated that 30 Metro did not send Dana a notice of default until February 21, 2020, more than two years after Dana had begun accruing, but not paying rent due to 30 Metro. The February 2020 notice of default informed Dana that it had "failed to pay all the 2018 Rent, all of the Rent for 2019, and the Rent due and owing from January 2020. In total, Dana owes Rent in the principal amount of $370,203.82." The notice goes on to explain:

> [P]ursuant to Section 14.2(b) of the Lease, Dana has thirty (30) days to cure its default by submitting payment in full of the past-due rental amounts of $370,203.82 via wire transfer to 30 Metropolitan Place at Dundee Bank. . . . Please be advised that if Dana fails to cure its default within thirty (30) days, 30 Metro is entitled to, among other things, terminate the Lease and pursue any remedy or right available to 30 Metro under the Lease or at law, including filing a lawsuit to collect these past due amounts and to evict Dana.

Given the language of the Master Lease, we conclude that 30 Metro was entitled to begin receiving prejudgment interest 30 days after it sent the February 21, 2020, notice of default, or on March 22, 2020. The district court, thus, erred in adopting 30 Metro's calculation of prejudgment interest, which calculated interest beginning on January 2, 2018, the day after Dana's first rental payment was due, but not paid. The terms of the agreement clearly provide that 30 Metro was only permitted to resort to the remedies listed in § 14.3, including prejudgment interest, after sending a written notice of default and after Dana had not cured its default within 30 days of receiving the written notice.

We recalculate the amount of prejudgment interest owed to 30 Metro beginning on March 22, 2020, through the date the judgment was entered, July 7, 2022, to be $101,871.98. In so finding, we agree with the district court's conclusion that the principal amount of rent due and owing was $370,203.82. 30 Metro is owed 837 days of interest on that amount at 12 percent per year.

### 5. DENIAL OF CREDIT TOWARD RENT OWED

Appellants next assign that the district court erred in denying the application of payments made by Dana directly to R4 as a setoff against any unpaid rent it owed to 30 Metro. During the trial, appellants presented evidence that Dana made payments directly to R4 to pay off certain bond payments. Specifically, Dana paid to R4 $15,877.94 in July 2019; $15,877.94 in October 2019; $15,000 in December 2019; and $57,780.80 in February 2020, for a total of $104,536.68. At the time these payments were made to R4, Dana was not paying monthly rent to 30 Metro. At trial, Agarwal testified that these bond payments were made to R4 in lieu of rent payments to 30 Metro. Agarwal explained that while Dana was not responsible for the payment of these bonds, it paid the money to R4 on behalf of 30 Metro and that, as such, the payments should be credited toward the amount of rent Dana owes to 30 Metro. The district court disagreed, finding that Dana "was not permitted to dictate that 30 Metro paid its bills in the order which benefited [appellants] most." The court found that the bond payments would not be accounted for as a credit against the past due rent Dana owed to 30 Metro. We agree with the findings of the district court.

Section 4.3 of the Master Lease provides, "Except as otherwise provided herein, all Rent and other sums payable hereunder by Tenant shall be paid without setoff, counterclaim, abatement, suspension, deduction or defense." There was no evidence presented at trial which demonstrated that Dana was permitted by 30 Metro to pay the rent owed to it directly to R4. In fact, the terms of the Master Lease explicitly provide that Dana was to remit monthly rent to 30 Metro "in lawful currency . . . , by delivering or mailing it to Landlord's address." There was no evidence to suggest that this term in the Master Lease had been amended in anyway. 30 Metro and R4 are entirely separate entities, even though R4 is the majority owner of 30 Metro. Dana was not permitted to unilaterally alter the terms of its lease agreement with 30 Metro by remitting bond payments in lieu of rent to R4. The district court did not err in denying the application of bond payments made by Dana directly to R4 as a setoff against any unpaid rent it owed to 30 Metro.

### 6. ORDERING JUDGMENT TO BE PAID WITH SPECIFIC FUNDS

In its order, the district court ordered appellants to "immediately transfer" to 30 Metro the funds held in the Mutual of Omaha/CIT Bank account, which Agarwal opened and controlled, but which was titled in 30 Metro's name. The court instructed that the $159,470.03 currently in the

Mutual of Omaha/CIT Bank account should be transferred to 30 Metro's actual bank account at Dundee Bank and that 30 Metro should "apply those transferred funds as a credit against the Judgment (to interest first, then to costs and then to principal), and shall then file a partial Satisfaction of Judgment in that regard." The district court reasoned that "R4, the 99.99% owner of 30 Metro, never consented to [appellants'] withholding of 30 Metro funds in the bank account. Additionally, [appellants] have not provided legal authority to withhold those funds."

In their brief on appeal, appellants contend that the district court erred in ordering them to transfer the funds in the Mutual of Omaha/CIT Bank account to 30 Metro to partially satisfy the judgment entered against them. Specifically, appellants assert:

> The District Court erred in ordering Appellants to transfer the funds in the Mutual of Omaha/CIT Bank account to [30 Metro's] account, as the court lacked authority to do so. The District Court directed Appellants to transfer the funds but did not explain the type of relief this entailed or its authority for granting such relief. The District Court erred in ordering this remedy because the judgment for monetary damages was a sufficient remedy, [30 Metro] failed to allege or prove the extraordinary circumstances warranting specific performance or injunctive relief, [30 Metro] did not request such relief in its Complaint, and such relief is not procedurally permissible as part of a money judgment in a breach of contract claim.

Brief for appellant at 38.

Upon our review, we conclude that while the question of whether to award 30 Metro the funds held in the Mutual of Omaha/CIT Bank account was not specifically raised in 30 Metro's complaint, it was fully litigated at trial by all parties. We also conclude that pursuant to the very unique facts present in this case, the district court did not err in awarding the funds in the account to 30 Metro and in giving appellants a credit toward the judgment in the amount held in this account.

In its complaint, 30 Metro did not specifically ask the court to award it the funds held in the Mutual of Omaha/CIT Bank account. However, 30 Metro did request "such other, further and different relief as this Court deems just and equitable." Additionally, during oral argument, counsel for 30 Metro indicated that prior to trial, a written opening statement and written request for relief was submitted. While such document was not included within our record, according to counsel, the document specifically and explicitly asked the district court to award it the funds held in the Mutual of Omaha/CIT Bank account. The trial record supports counsel's representation as the issue of whether the funds deposited in the Mutual of Omaha/CIT bank account should be transferred to 30 Metro's account at Dundee Bank was fully litigated by all of the parties during the course of trial. Both 30 Metro and appellants put on evidence regarding the creation of the account, the management of the account, and the amount of funds placed into the account. Nowhere in our record is there any sort of procedural objection made by appellants about whether this topic was properly before the court. Instead, appellants made substantive arguments that no award of funds to 30 Metro was justified, including those funds deposited in the Mutual of Omaha/CIT account. Based upon these facts, we conclude that the issue of how to handle the funds held in the account was properly before the district court.

Given the evidence presented at trial, we affirm the district court's decision to award 30 Metro the funds held in the Mutual of Omaha/CIT Bank account. At trial, both Agarwal and Gorman testified to their belief that the funds placed in this account was money owed by Dana to 30 Metro for rent. Specifically, such testimony indicated that after receiving the demand letter from 30 Metro, Dana completed its own calculation of past due rent and deposited the corresponding amount into the Mutual of Omaha/CIT Bank account, rather than depositing it into 30 Metro's actual bank account as the demand letter instructed. Additionally, the evidence clearly demonstrated that the account was titled in 30 Metro's name. Agarwal explained that when he opened the account he believed that he was acting as an authorized representative of 30 Metro. Essentially, all of the parties agreed that the money in the account, which was titled in 30 Metro's name, constituted unpaid rent owed to 30 Metro. Given these unique facts, we simply cannot find error in the district court's decision to award the entirety of the account to 30 Metro and to give appellants a corresponding credit toward the judgment it owed to 30 Metro.

## VI. CONCLUSION

Upon our review of the district court's order awarding 30 Metro past due rent, prejudgment interest, and court costs, we affirm the decision of the district court in all respects except that we modify the district court's calculation of the amount of prejudgment interest owed to 30 Metro. Pursuant to the Master Lease, prejudgment interest was to begin accruing 30 days after appellants received a demand letter, rather than immediately after their first missed rent payment.

AFFIRMED AS MODIFIED.